## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| **STRYKER CORPORATION**, a Michigan corporation; **HOWMEDICA OSTEONICS CORP.**, a New Jersey corporation; | ) ) ) | |
| | ) | Case No. |
| Plaintiffs, | ) | The Honorable _____ |
| | ) | |
| v. | ) | **JURY DEMAND REQUESTED** |
| | ) | |
| **CHRISTOPHER RIDGEWAY**, an individual; **RICHARD STEITZER**, an individual; **BIOMET, INC.**, an Indiana corporation; | ) ) ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiffs STRYKER CORPORATION and HOWMEDICA OSTEONICS CORP. (collectively "Stryker"), for their Complaint for Injunctive and Other Relief against Defendants CHRISTOPHER RIDGEWAY ("Ridgeway"), RICHARD STEITZER ("Steitzer"), and BIOMET, INC. ("Biomet") (Ridgeway, Steitzer, and Biomet are sometimes collectively referred to as "Defendants"), state as follows:

### INTRODUCTION

Over the past two weeks, Stryker uncovered an ill-conceived and long-planned scheme by Biomet, using Stryker representatives in both New York (Steitzer) and Louisiana (Ridgeway), to erode Stryker's customer relationships and raid sales teams from Stryker's Neuro Spine ENT ("NSE") business unit and Craniomaxillofacial ("CMF") division. Complete with secret code words Biomet's scheme involved Ridgeway and Steitzer as  proxies, **while still Stryker employees**, to intentionally damage Stryker and sabotage its ability to compete in a highly competitive marketplace.

As Stryker employees and since leaving their employment, Ridgeway and/or Steitzer

conspired with Biomet to: (1) convert existing Stryker employees to work for Biomet; (2) prevent Stryker from successfully hiring and retaining new employees in order to secure Biomet's foothold in certain territories; (3) sabotage Stryker's existing customer relationships to convert business to Biomet; and (4) secretly channel Stryker's confidential information to Biomet, including its customers' preferences, margins, sales quotas and targets, and financial performance in the territories.  During the course of his September 10, 2013 exit interview, Ridgeway brazenly announced that he devoted only 50% of his time to what he referred to as the "Stryker dog and pony show" and instead parlayed his Stryker contacts to divert opportunities, and potential Stryker employees, to his personal side businesses.

These continuing malicious and opportunistic actions have resulted in the loss of significant business with expected losses exceeding $3 million.  Through this action, Stryker seeks to bring an immediate end to the Defendants' scheme, through a preliminary, and ultimately permanent, injunction to protect Stryker's CMF and NSE businesses, Stryker's customer relationships, goodwill and its trade secrets, and to recover the millions of dollars in damage already caused by Defendants.

## NATURE OF THE ACTION

1.      This is an action for breach of contract, breach of fiduciary duty, misappropriation of trade secrets, and tortious interference with contract.   Stryker seeks preliminary and permanent injunctive relief, in addition to other damages.

2.      Plaintiffs, through their CMF Division and NSE business unit, are global leaders in the development, manufacture and sale of medical device technologies.  CMF manufacturers and sells biomaterials, fixation systems, its Leibinger maxillofacial plating systems for bone fixation and other CMF fractures, neuro plating systems, customized implants, Duramatrix

2

biomaterials, and surgical instruments.  Stryker Instruments, through its NSE business unit, manufactures and sells aspirators, drills, Sonopet Ultrasonic Aspirator, CORE drills, drills, Microdebriders, NasoPore cutting accessories, as well as other surgical instruments and products.

3.     Until recently, Ridgeway was employed as the District Sales Manager for the CMF division and managed sales for the NSE business unit in the South Louisiana region, which includes New Orleans.  In this position, Ridgeway interacted, both directly and indirectly, with some of Stryker's most valued customers.

4.     Likewise, until recently, Steitzer was employed as an Area Sales Representative for the CMF division and also worked as a sales representative on behalf of the NSE business unit, having responsibilities in the Albany, New York region.  In these positions, Steitzer interacted, both directly and indirectly, with some of Stryker's most valued customers.

5.     In early September 2013, Stryker first came to learn that Ridgeway was not devoting his full efforts to Stryker's business.  Instead, Stryker learned that Ridgeway was devoting at least 50 percent of his time to operating two medical supply side businesses, through which he was exploiting relationships with Stryker's customers to sell other medical devices. Moreover, Stryker learned that Ridgeway was requiring other Stryker employees to participate in such sales endeavors for his side businesses.

6.     Also, in early September 2013, Stryker first came to learn of Ridgeway's efforts to divert business to Biomet.  Over the course of the next several weeks, Stryker gathered information and communications indicating that Ridgeway had explicitly committed to serve as an agent for Biomet Microfixation and Spine in Louisiana, a direct competitor of Stryker.

7.     During his employment with Stryker, Ridgeway was exposed to and helped develop Stryker's confidential information related to their CMF and NSE product offerings,

3

including product development, launch dates, market focus, selling strategies, and pricing with respect to Stryker's various CMF and NSE product lines.

8.      On September 10, 2013, Stryker terminated Ridgeway based upon his improper activities.  During the course of his exit interview that same day, Ridgeway disclosed that Steitzer—who voluntarily terminated his employment with Stryker in June 2013—had disclosed Stryker's confidential information to Biomet about their CMF and NSE businesses in the Southeast Region.

9.      Investigating these claims further, Stryker discovered that not only had Steitzer misappropriated Stryker's trade secrets and disclosed those trade secrets to Biomet, but Steitzer was further breaching his non-competition and non-solicitation agreement by soliciting and moving Stryker's business to Biomet.  This conduct is even more egregious insomuch as Stryker had, between June and present, been paying Steitzer to sit on the sidelines, per one of the terms contained in the non-compete agreement.

10.      Moreover, within the last week, Stryker learned that Ridgeway induced another of Stryker's Sales Representatives, Sheldon Green, to terminate his employment with Stryker on September 23, 2013.  Green is now working for Biomet in the South Louisiana territory.  Stryker further recently learned that, without a legitimate business purpose, Ridgeway forwarded the customer list of the Louisiana territory to Green  in July 2013.

11.      Biomet, through its efforts with Ridgeway and Steitzer, is now utilizing that confidential information and customer relationships to erode Stryker's standing in the market, potentially costing Stryker losses of business valued in the millions of dollars.  Stryker's confidential information, however, is invaluable, the loss of which would provide an immediate benefit to Biomet, and an equally immediate detriment to Stryker.

4

12.     Biomet knows that Stryker employees sign non-competition and confidentiality agreements with Stryker, and Biomet actively assisted Ridgeway in an effort to circumvent those obligations.  On information and belief, Biomet also actively assisted Steitzer in his efforts to circumvent his obligations owed to Stryker.

13.     Ridgeway's and Steitzer's actions violate their contractual obligations to Stryker, and Ridgeway's acts further violate his common law fiduciary obligations owed to Stryker. Moreover, Biomet has and continues to tortiously interfere with Stryker's agreements with Ridgeway and Steitzer.

14.     Additionally, Defendants misappropriated and/or threaten to misappropriate Stryker's trade secret and confidential information, including, but not limited to, their pricing information, margins, customer preferences, and customer contracts, amongst other things.

15.     Accordingly, Stryker seeks to preliminarily and permanently enjoin Defendants from using or threatening to use or inevitably using Stryker's confidential information, from interfering with Stryker's customers, employees, and contractual relationships, and from Ridgeway and Steitzer breaching and Biomet inducing the breach of Ridgeway's and Steitzer's contracts with Stryker.  In addition, Stryker seeks to preliminarily and permanently enjoin Ridgeway and Steitzer from their ongoing breach of their contractual obligations owing to Stryker.

16.     Absent such injunctive relief, Stryker faces irreparable injury, including the loss of customers, its competitive advantage, its confidential information and goodwill in amounts which may be impossible to determine unless Defendants are enjoined and restrained by order of this Court.

## PARTIES

17.     Stryker Corporation is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Kalamazoo, Michigan.

18.     Howmedica Osteonics Corp. is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Mahwah, New Jersey, and is a wholly owned subsidiary of Stryker Corporation.

19.     Biomet, Inc. is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business in Warsaw, Indiana.

20.     Christopher Ridgeway was employed by and/or worked for Plaintiffs starting in November 2001 until September 10, 2013.  Ridgeway is domiciled in and a resident of Metairie, Louisiana.

21.     Richard Steitzer III was employed by and/or worked for Plaintiffs starting in March 2005 until June 7, 2013.  Steitzer is domiciled in and a resident of Ballston Lake, New York.

## JURISDICTION AND VENUE

22.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states (Stryker is a Michigan corporation with its principal place of business in Michigan, Howmedica is a New Jersey corporation with its principal place of business in New Jersey, Ridgeway is a Louisiana citizen, Steitzer is a New York citizen, and Biomet is headquartered in Indiana with its principal place of business there) and the matter in controversy exceeds $75,000.00 excluding interest and costs.

23.     This Court has personal jurisdiction over Defendants, and venue is proper in this District under 28 U.S.C. § 1391(a) pursuant to the Employee Non-Compete Agreement (the

"Agreement"), through which both Ridgeway and Steitzer consented to personal jurisdiction and venue in this Court, and because Biomet has committed and continues to commit tortious acts in and/or related to this State and regularly conducts business in Michigan. Additionally, Stryker's principal place of business is in Kalamazoo, Michigan, and it regularly conducts business in Michigan, and Howmedica's CMF division is headquartered in Portage, Michigan.

## EVENTS GIVING RISE TO THIS ACTION

### STRYKER'S BUSINESS

24.     Stryker, through its CMF division and NSE business unit, is a global leader in the development, manufacture and sale of medical device sales. CMF manufacturers and sells biomaterials, fixation systems, radio frequency devices, including its Leibinger maxillofacial plating systems for bone fixation and other CMF fractures, neuro plating systems, customized implants, Duramatrix biomaterials, and surgical instruments. Stryker Instruments, through its NSE business unit, manufactures and sells aspirators, drills, Sonopet Ultrasonic Aspirator, CORE drills, drills, Microdebriders, NasoPore cutting accessories, as well as other surgical instruments and products.

25.     Stryker is a global leader in the development, manufacture and sale of medical surgery-related instruments, implants, and other medical surgery-related products and services.

26.     Stryker invents, designs, manufactures, and sells a full range of instruments and devices used in a wide variety of surgical procedures. These products make surgeries and recoveries simpler, faster and more effective.

27.     Stryker's products have a broad appeal and acceptance in the marketplace and among the surgical community.

28.     The surgical device and products industry is highly competitive. One of Stryker's

7

direct (and largest) competitors is Biomet.

29.     To sell its products, Stryker relies heavily on Sales Representatives, like Ridgeway and Steitzer, and the relationships they cultivate on Stryker's behalf with the surgeons in their respective territories.  Sales Representatives provide technical product information and specifications, coordinate training for surgeons utilizing its products, and are frequently present during surgical procedures to provide technical assistance and knowledge to the surgeons and medical staff.  As a result, Sales Representatives become the face of Stryker to their clients.

30.     Sales Representatives are primarily responsible, in part, for cultivating and growing relationships with surgeons in their territory.  They also provide technical support and assistance to surgeons during surgeries, showcase Stryker's products and train surgeons on Stryker's highly specialized and state-of-the-art products.

31.     Surgeons who use Stryker's products constitute a significant portion of Stryker's customer base.  Stryker invests substantial time and resources to build and maintain goodwill and long-term relationships with surgeons and hospitals.

32.     In terms of customer preferences, every surgeon has his or her own protocol in the operating room, and this protocol varies from surgeon to surgeon.  Therefore, a critical element in maintaining a strong customer relationship is the knowledge of a surgeon's preferences and method of operating.  All of this information is not generally available to the public, is of great value to Stryker and would give any of Stryker's competitors who acquired such information, such as Biomet, an unfair competitive advantage.

33.     Stryker also spends a significant amount of time and money developing and maintaining long-term relationships with its customers.  These relationships often take years to establish and are crucial to the success of Stryker's business. Stryker's customers typically

become very loyal to the Sales Representatives with whom they work, due to the emphasis Stryker puts on providing an exceptional level of customer service and investing in the relationships.

## RIDGEWAY'S EMPLOYMENT WITH STRYKER

34. Ridgeway began working for Stryker on November 9, 2001 as a Sales Representative in the New Orleans territory-East Division.

35. Prior to Ridgeway's employment with Stryker, Ridgeway executed the Agreement on October 24, 2001.

36. Stryker sent this Agreement to and, on information and belief, Ridgeway executed the Agreement in Jackson, Mississippi.

37. Prior to Stryker hiring Ridgeway, Ridgeway had minimal prior experience selling medical devices or working in the medical device industry.

38. Stryker invested time, energy and resources into Ridgeway, including significant training courses.

39. As a Sales Representative, Ridgeway directly interacted with and promoted Stryker's products with new clients and its existing clients, spending time each month with physicians in an effort to increase and maintain Stryker's presence in those hospitals.

40. Ridgeway was responsible for the marketing and sale of Stryker's products by, in part, cultivating and growing relationships with surgeons and hospitals in his territory. Specifically, Sales Representatives provide technical product information and specifications to surgeons, coordinate training for surgeons utilizing Stryker's products and are frequently present during surgical procedures to provide technical assistance and knowledge to the surgeons and medical staff. As a result, Ridgeway became the face of Stryker to these hospitals and its

9

physicians.

41.     On January 1, 2012, Ridgeway was promoted by Stryker to the position of District Sales Manager for the CMF division and NSE business unit in the South Louisiana Region.

42.     In this position, Ridgeway was responsible for:

    a.   Assisting the Regional Manager in locating, interviewing and hiring top level sales talent for sales representative positions;

    b.   Training and developing new sales personnel;

    c.   Developing plans in accordance with the Regional Managers to maximize sales opportunities in the region;

    d.   Developing and recommending strategic plans with representatives to achieve greater market share / penetration;

    e.   Working to get sales representatives exposure to key accounts and helping develop customer relationships;

    f.   Preparing monthly highlights and necessary reports to keep the Regional Managers adequately informed of progress;

    g.   Assisting sales representatives in the negotiation of sales transaction and divisional agreements;

    h.   Developing and motivating sales personnel to meet stated objectives;

    i.   Providing input on constructing new sales territories in order to facilitate company growth;

    j.   Working with Stryker's marketing departments to keep sales force informed of new information pertaining to the market;

    k.   Adhering regularly to all GMP policies and procedures as stipulated by the FDA; and

    l.   Coaching and developing sales personnel in the region in accordance with the Regional Manager's goals and objectives.

43.     In this role, Ridgeway gained a management position and was provided further access to confidential information related to other sales representatives in his territory.

## STEITZER'S EMPLOYMENT WITH STRYKER

44.    Richard Steitzer began working for Stryker on March 3, 2005 as an Associate Sales Representative in the Albany territory in New York.

45.    In 2006, Steitzer was promoted to the position of Sales Representative for the Greater New York territory.  In this position, Steitzer interacted, both directly and indirectly, with some of Stryker's most valued customers, having responsibility for the Albany, New York territory.

46.    In this role, Steitzer was responsible for selling, marketing, and servicing Stryker's CMF and NSE product lines to customers in the Albany territory.

47.    In this position, Steitzer was responsible for:

   a. Planning, directing and coordinating the selling of Stryker CMF and NSE products in accordance with budgeted objectives to obtain maximum profitability and volume in relation to pre-set standards;

   b. Representing Stryker as a leader in the industry and marketplace by working with surgeons and healthcare professionals;

   c. Implementing new sales plans and effective marketing strategies to position the organization competitively and meet/exceed territory objectives;

   d. Identifying the needs of new prospects and developing appropriate responses (written, telephone, face to face);

   e. Performing field calls for the account and assigned territory (including "on-call" and operating / emergency room consultation);

   f. Cross-selling additional products or managing new product introductions as they become available;

   g. Addressing any problems that arise on the account;

   h. Supporting compliance and the principles of responsibility (AdvaMed) by maintaining the privacy and confidentiality of information, protecting the assets of the organization, acting with ethics and integrity, reporting non-compliance, and adhering to applicable federal, state and local laws and regulations, accreditation and licenser requirements and Company policies and procedures;

11

16210651v.1

    i.    Working with sales management by coaching, training or mentoring Sales Associates as needed;

    j.    Maintaining training in sales skills and products;

    k.    Remaining current on industry, customer, and competitive trends; and

    l.    Participating and attending sales meetings and professional association meetings outside of regular business hours, as required.

### STRYKER'S CONFIDENTIAL AND PROPRIETARY INFORMATION

48.    In their roles, both Ridgeway and Steitzer worked directly with all aspects of Stryker's CMF division and NSE business unit.  As a result of this work, both Ridgeway and Steitzer know Stryker's confidential information, including Stryker's:

    a.    Equipment placement strategies;

    b.    Marketing plans and promotional strategies for the region;

    c.    Pricing strategies, including terms and conditions of sales, profit margins, product pricing discounts, bulk purchase pricing, etc.;

    d.    Customers' contract terms and preferences;

    e.    Competitive strategies, including those against Biomet; and

    f.    Customer retention strategies, including strategies for withstanding competitive pressure from Biomet and others.

49.    Additionally, both Ridgeway and Steitzer had access to information about all of Stryker's customers, what products they purchased, when such products were purchased, what disposables they utilized, including the specific quantities utilized, and pricing information relating to those customers.

50.    Moreover, given their positions, both Ridgeway and Steitzer attended Stryker National Sales Meetings each year during their entire careers with Stryker, where Stryker shared confidential and proprietary information relating to Stryker's products, sales programs, and other company-wide strategies, including new product development, long and short-term strategic

sales plans, and other confidential competitive strategies.

51.     Additionally, Ridgeway and Steitzer participated in weekly and monthly calls during which detailed and highly confidential information regarding Stryker's CMF and NSE product sales, strategies, and pricing were discussed.

52.     In order to perform their responsibilities effectively, Sales Directors and Sales Representatives—like Ridgeway and Steitzer—are given access to confidential and proprietary information concerning Stryker's: (i) operations, products, pricing formulae, manufacturing processes, research and development activities, efficacy testing, and analysis of competitive products; and (ii) customers, including, but not limited to, customer lists, customer preferences, strategies for soliciting prospective customers, pricing information, analytical results of competitive product comparisons, customer marketing data and purchasing patterns, applicable discount codes and planned research and development for its customer base.

53.     In addition to confidential information relating to Stryker's CMF and NSE products and customers (noted above), Ridgeway and Steitzer also had access to highly confidential information regarding Stryker's sales representatives, including, among other things, the specific surgeons and hospitals certain sales representatives were targeting; sales history broken down by territory, representative, product and customer; and specific sales quotas and whether certain sales representatives reached or exceeded their quotas.

54.     Stryker requires that its information be kept strictly confidential by its employees and restricts access to this information.   Stryker takes specific measures to preserve the confidentiality of this information, including, but not limited to, the following:

> a.  Requiring employees to sign confidentiality agreements containing covenants designed to maintain confidentiality and to return Stryker's property upon termination;

13

b.  Requiring their employees to maintain confidentiality of Stryker's information and protect Stryker's assets;

c.  Prohibiting the use of Stryker's computer systems for non-company purposes;

d.  Restricting their access to computerized information through the use of passwords;

e.  Prohibiting the unauthorized physical removal of company information (via paper, disc, flash drive or other media) and electronic transmission of such information (via email or other means); and

f.  Restricting their access to computerized company information based on each individual employee's "need to know" the particular information.

55.  Stryker rigorously maintains the confidentiality of their information because the information provides Stryker a competitive advantage in the marketplace from which Stryker derives economic value.

56.  Stryker's trade secrets and confidential and proprietary information are of great value to Stryker and would give any competitor of Stryker—including Ridgeway, Steitzer, and Biomet—an unfair competitive advantage by: not expending the time and resources to develop the trade secret and confidential and proprietary information as Stryker did; quickly developing products and technologies to unfairly compete with Stryker in order to diminish Stryker's head start; alerting a competitor as to initiatives that should not be pursued; and other improper advantages.

### RIDGEWAY & STEITZER'S POST-EMPLOYMENT OBLIGATIONS OWED TO STRYKER

57.  On October 24, 2001, Ridgeway executed the Employee Non-Compete Agreement (the "Agreement") that contains certain post-employment contractual obligations owing to Stryker.  A true and correct copy of Ridgeway's Agreement is attached as Exhibit A.

58.  On March 1, 2005, Steitzer executed the Employee Non-Compete Agreement (the

14

"Agreement") that contains certain post-employment contractual obligations owing to Stryker. A true and correct copy of Steitzer's Agreement is attached as Exhibit B.

59.     Based on the terms of the Agreement, both Ridgeway and Steitzer received employment, access to and receipt of Stryker's trade secrets and confidential information, the furnishing of Ridgeway and Steitzer with sales territories, training, and compensation, all of which was expressly conditioned on Ridgeway and Steitzer agreeing to and executing the Agreement.

60.     In each circumstance, Ridgeway and Steitzer were required to execute their Agreement, otherwise they would not have received a job, received Stryker's confidential information, or gained access to Stryker's customers.

61.     The Agreements define "Confidential Information" as:

[the] Company and its affiliates which are involved in Company's medical device and implants business, including information relating to their operations, products, pricing formulae, manufacturing processes, research and development activities, efficacy testing, and analysis of competitive products, and Company customers, including, but not limited to, customer lists; pricing information; analytical results of competitive product comparisons; customer marketing data and purchasing patterns; applicable discount codes; and planned research and development for its customer base and Employee's sales territory.

(Agreement at p. 1.) (Exs. A and B).

62.     In addition to prohibiting the disclosure of Stryker's confidential information, the Agreement contains narrowly tailored post-employment restrictive covenants, which are designed to protect Stryker's goodwill, long-standing customer relationships and employee relationships, and confidential information.

63.     Specifically, Ridgeway and Steitzer agreed that during the course of their employment with Stryker and for one year after the termination of their employment for any reason, they would not:

15

  a. Engage or participate in any employment or activity competitive with Company. This restriction applies to any competitive employment or activity that is directed to or designed to solicit or divert any of Company's customers and/or any customers that Employee contacted, targeted as a potential prospect or serviced while in the employ of Company ("Company's Customers"), for Employee's or any Company competitor's benefit;

  b. Solicit, attempt to solicit, assist another to solicit Company's Customers, or in any other way, attempt to influence Company's Customers to alter or terminate their business relationship with Company; and

  c. Induce or influence, or attempt to induce or influence, any person engaged as an employee or agent of Company to terminate his/her relationship with Company.

(Agreement at §1.)(Exs. A and B).

64. Each of the non-solicitation provisions is limited to the sales territory in which Ridgeway or Steitzer worked following his termination of his employment.  (Id.)

65. Ridgeway and Steitzer each agreed that he "consents and agrees that any and all litigation between him and [Stryker] relating to this Agreement shall take place in the State of Michigan and [Ridgeway/Steitzer] expressly consents to the jurisdiction of the federal and/or state courts in Michigan."  (Agreement at § 12) (Exs. A and B).

66. Moreover, both Ridgeway and Steitzer consented that "[t]his Agreement shall be construed in accordance with and governed for all purposes by the law of the State of Michigan." (Agreement at § 13) (Exs. A and B).

67. On May 28, 2002, Ridgeway executed the Employee Confidentiality and Intellectual Property Agreement ("Confidentiality Agreement").  A true and correct copy is attached as Exhibit C.

68. On March 1, 2005, Steitzer executed the same form of Confidentiality Agreement as Ridgeway.  A true and correct copy is attached as Exhibit D.

69. Through the Confidentiality Agreement, both agreed "to hold in confidence and

16

not to disclose any and all Confidential and Proprietary Information, Inventions, and Copyrightable Works without approval or authorization from Stryker."  (Confidentiality Agreement at § 2) (Exs. C and D.)

70.     Moreover, both also agreed that upon his termination of his employment with Stryker, he would "return to Stryker any and all information and material relating to Stryker's business, products, personnel or customers, whether or not such material is deemed to be confidential or proprietary.  Thereafter, any continued possession will be deemed to be unauthorized." (Confidentiality Agreement at § 4(a)) (Exs. C and D.)

71.     Additionally, upon his termination, Ridgeway and Steitzer were both required to return, amongst other things, "all customer files, account files, price lists, product information, training manuals, and handbooks; and all other documents relating to Stryker's business, products, personnel, and customers."  (Confidentiality Agreement at § 4(b)) (Exs. C and D.)

72.     The Confidentiality Agreement also contains a Michigan choice of law provision. (Confidentiality Agreement at § 7) (Exs. C and D.)

## RIDGEWAY AND BIOMET ENGAGE IN DUPLICITOUS CONDUCT AT STRYKER'S EXPENSE

73.     In early September 2013, Stryker learned that Ridgeway was not devoting his full efforts to Stryker's business.  Instead, Stryker learned that Ridgeway was devoting at least 50 percent of his time to operating two medical supply side businesses, through which he was exploiting relationships with Stryker's customers to sell other medical devices.  Moreover, Stryker learned that Ridgeway was requiring other Stryker employees to participate in such sales endeavors for his side businesses.

74.     During his employment with Stryker, Ridgeway formed and operated a company named Stone Surgical LLC in November 2009.  This is not permitted by Stryker, a fact

17

Ridgeway knew or should have known.

75.     With Stone Surgical, Ridgeway assisted his brother, Patrick Ridgeway, as a distributor and Area Sales Representative for distribution of genetic testing products for National Molecular Testing Corporation.

76.     Moreover, Ridgeway also formed a company known as UTC Laboratories, LLC, now known as Renaissance RX, with his brother Patrick Ridgeway, amongst others.

77.     As late as November 2012, Ridgeway was inviting other sales representatives who reported to him for Stryker, to participate in Natural Molecular.  Included in this behavior, Ridgeway provided certain Stryker sales representatives with reports on product offerings and information related to Natural Molecular.

78.     In August 2013, government complaints related to Natural Molecular forced Ridgeway to shut down this company, but Ridgeway began offering a similar product through Renaissance RX.

79.     Ridgeway leveraged the relationships he developed through the sale of Stryker's products as an entry for him to make sales of Natural Molecular's genetic testing products.

80.     In addition to the over 50 percent of time that Ridgeway dedicated to his side businesses, he also failed to adequately service Stryker's businesses, including but not limited to:

     a.  Refusing to hire qualified candidates necessary to support the South Louisiana market, rejecting all 33 candidates who interviewed with or applied for employment with Stryker;

     b.  Attempting to hire and actually hiring employment candidates for the benefit of his side businesses; and

     c.  Making the branch so hostile that four employees have resigned in the past 20 months, resulting in an 80% turnover rate during that time period.

81.     Indeed, one potential employee was never placed through the formal interview

process. Rather, Ridgeway took him on sales "ride-a-longs." Although the potential employee sent a formal "thank you" letter to Stryker for the opportunity to interview, Ridgeway instead hired him to work for his side businesses.

82. Most egregiously, however, since January 2013, Ridgeway has worked as Biomet's proxy to disrupt Stryker's operations and damage the Stryker brand in South Louisiana.

83. In June 2013, Ridgeway informed his sales representatives that Biomet expressed interest in bringing the Stryker CMF and NSE sales teams to Biomet and that Biomet would "offer us a lot of money."

84. Over the course of the next few months, Ridgeway was in conversations with Biomet regarding moving Stryker business to Biomet. He was nervous about Stryker finding out his plans, and used the code word "pancake" to discuss the business he planned to "flip."

85. These efforts came to a head on July 3, 2013. On that date, Ridgeway and another Sales Representative went to a hotel room at the Roosevelt Hotel in New Orleans where Biomet wanted to show them its product offerings and discuss possible employment. At that time, the Sales Representative was in the midst of servicing a Stryker client, to which Ridgeway told the representative to "forget" that client and "come to the hotel."

86. During the course of the meeting, Ridgeway identified to Biomet certain specific Stryker customer preferences and needs, product usage, and also provided a comparison evaluation of Biomet's presented products versus Stryker's existing products. This information constituted Stryker's confidential information and was information that Ridgeway was not authorized to disclose to Biomet.

87. Biomet also identified that its strategies were to rapidly produce competitive products to Stryker to meet customer demand and to move Stryker's business to Biomet,

utilizing Ridgeway's Stryker experience and access to Stryker's customers.

88.     Biomet worked with Ridgeway in an effort to bypass Stryker's non-compete, using Ridgeway as a go-between between Stryker's employees, including Sheldon Green and Lauren Border, and Biomet.

89.     Ridgeway used his knowledge of Stryker's confidential and proprietary information to enter the market and sell his genetic testing devices to Stryker's customers.

90.     Ridgeway diverted Stryker's funds to promote his personal business.

91.     Between July 3, 2013 and September 6, 2013, Ridgeway that he intended to move Stryker's business to Biomet en masse and that to make this move work he would have to reach agreements with Stryker's customers before leaving Stryker's employment to start purchasing from Biomet.

92.     As part of his plan, Ridgeway requested that one of his sales representatives "make a sheet for all accounts that list administrators, director, team leads, docs SPD and PO people."  The sales representative did not assist Ridgeway in making this list, but Ridgeway created such a handwritten list that he considered to be his "business plan" for Biomet.  The "business plan" identified these key Stryker relationships, and also included information related to the value of each account, and the amount of medical device sets that Biomet would need to have ready for him if he was going to flip the business.

93.     Ridgeway shared this business plan with Biomet, resulting in Biomet preparing sets for Ridgeway prior to his departure from Stryker, and planning to making those sets available to Ridgeway while he was still a Stryker employee.

94.     Moreover, in mid-July, Ridgeway sent a list of Stryker's CMF and NSE customers to Green.  No valid basis existed for Ridgeway to share this information with Green as

Green's territory was solely in Georgia and Green had not requested a transfer to Louisiana.

95.     On September 23, 2013, Green resigned from Stryker.  Although he has to date refused to disclose his current employer—despite contractual obligations to do so—Stryker observed Green attempting to sell Biomet products in a number of Louisiana hospitals, uncovered emails from Ridgeway to Green in mid-July divulging Stryker's Louisiana customers, and a September 8, 2013 email from Biomet to Green soliciting Green for employment.  Based on these facts, Stryker is informed and believes that Green works with Ridgeway on behalf of Biomet.

96.     Also in Green's resignation letter, despite claiming to provide two-week notice, Green abandoned a procedure scheduled for that day, threatening that "a competitor" would take the business if Stryker could not attend the procedure and proceeded to ignore Stryker's repeated attempts to reach him by cell phone and email.

97.     Prior to September 6, 2013, Ridgeway solicited two Stryker doctors for his genetic testing company, as well as for the benefit of Biomet.

98.     These two doctors, if they were to stop doing business with Stryker, would put at risk approximately $3 million in Stryker's business.

99.     By September 6, 2013, Ridgeway confirmed that the conversion of the Stryker business was a done deal, that he had an operational staff in place, and that he would be ready to turn the business over to Biomet by October.

100.     It was not until September 8th that Stryker first learned of Ridgeway's plan to leave for Biomet and his attempts to move Stryker's business en masse to Biomet.

101.     On September 10, 2013, Stryker terminated Ridgeway, identifying his malfeasance as the reason for the termination.  A true and correct copy of the termination letter is

21

attached as Exhibit E.

102.    During the termination meeting, Stryker demanded that Ridgeway turn over Stryker's confidential information in his possession and demanded that he return it by September 12, 2013, including a Stryker iPad, all electronic information on Ridgeway's personal laptop, and any other documents in Ridgeway's possession.

103.    During the week of September 23rd, Ridgeway returned the iPad, but has not turned over any other Stryker confidential information.

104.    During the termination meeting, Ridgeway told Stryker that Steitzer disclosed to Biomet Stryker's financial information relating to the Southeast region, including within Ridgeway's territory.

105.    Also during the termination meeting, Ridgeway confirmed that he was spending between 50 to 60 percent of his time on his side businesses and only 40 to 50 percent of his time on "the Stryker dog and pony show."

106.    As a result of Ridgeway's actions, Stryker's CMF and NSE businesses—in Louisiana, generally, in New Orleans, specifically, and with several significant customers— declined significantly over sales made in 2012.

107.    Moreover, following his termination, Stryker is aware that Ridgeway is soliciting Stryker's customers to leave Stryker for Biomet.  Stryker is aware of at least eight (8) instances in which it observed Ridgeway at their customers' facilities or their customers' personnel informed Stryker that Ridgeway was soliciting them on behalf of Biomet.

108.    It is Stryker's belief that Ridgeway shared confidential information as to each of these hospitals, as Ridgeway made presentations relevant to each hospital's needs, as previously serviced by Stryker, in the two days following his termination.

22

109. For example, the day after his termination, Stryker was informed by a hospital in Baton Rouge that the NSE administration was reviewing a package from Biomet provided by Ridgeway, and that Ridgeway already had a custom set with him to provide this hospital. Stryker also was informed that Ridgeway was saying negative things about Stryker. The loss of this business would cause incalculable harm to Stryker's good will established at this location over the past several years, as well as the loss of millions of dollars in revenue for Stryker.

110. At another hospital located in Marrero, Louisiana, the main surgeon at this location called Stryker recently to inform Stryker that a custom cranial procedure had been cancelled. Stryker subsequently learned that a custom cranial procedure was performed by Biomet at this location. This surgeon is one of the surgeons that Ridgeway solicited prior to his departure from Stryker, and who Ridgeway solicited to follow him after he left.

111. Stryker also saw Green, the sales representative solicited by Ridgeway to leave Stryker and move to Biomet from Atlanta, at the hospital in Marrero and at Tulane University.

## STEITZER'S BAD ACTS TOWARD STRYKER & EMPLOYMENT WITH BIOMET

112. Investigating Ridgeway's claims about Steitzer further, Stryker discovered that not only had Steitzer misappropriated Stryker's trade secrets and disclosed those trade secrets to Biomet, but Steitzer was further breaching his non-competition and non-solicitation agreement by soliciting and moving Stryker's business to Biomet.

113. In 2013, there was a significant downward trend in Steitzer's sales performance with some of Stryker's strongest relationships.

114. Although this was initially determined to be poor performance, it now appears that Steitzer was intentionally undertaking efforts to move business from Stryker to Biomet prior to his departure from Stryker in anticipation of his new role at Biomet.

115.    Steitzer terminated his employment with Stryker on June 7, 2013.

116.    Pursuant to the terms of his Agreement, Stryker has made bi-monthly severance payments to Steitzer in compliance with the terms of his Agreement.

117.    Steitzer has accepted each of these payments, and had informed Stryker that he had accepted employment with Biomet to work in an unrelated medical device sales position.

118.    However, Stryker has come to learn over the past few weeks that Steitzer has not adhered to his contractual obligations, despite accepting the severance payments.

119.    Rather, he has continued to sell CMF and NSE products to the same facilities and in the same territory he serviced while employed by Stryker.

120.    Specifically, Steitzer has gone into multiple facilities within his former territory and attempted to solicit business on behalf of Biomet, including business at three of Stryker's most profitable hospitals in the Albany area, diminishing Stryker's business by hundreds of thousands of dollars this year alone.

121.    In at least one instance, Steitzer successfully convinced the facility to cease doing business with Stryker and to, instead, utilize Biomet products.

122.    The result of the loss of this one facility has been in excess of $600,000 in sales to date.

123.    Steitzer has also provided sales quota and target data to Biomet related to Stryker's regions across the country, and provided further information to allow Biomet intelligence into Stryker's sales team in other regions, such as Louisiana, in an effort to improperly solicit those employees to Biomet's benefit and the detriment of Stryker, a fact disclosed by Ridgeway in his exit interview with Stryker on September 10, 2013.

124.    Disclosure of such information by Steitzer to Biomet is a direct violation of

24

Steitzer's confidentiality obligations owed to Stryker under both the Agreement and the Confidentiality Agreement.

## EFFECT OF RIDGEWAY'S AND STEITZER'S EMPLOYMENT WITH BIOMET

125.    With the departures of Ridgeway and Steitzer and their knowledge of Stryker's confidential information, Stryker stands to lose several millions of dollars in business and the loss of value of their goodwill, customer relationships, trade secrets and confidential and proprietary information, which cannot be adequately addressed at law.

126.    By definition of their positions with Biomet, Ridgeway and Steitzer will undoubtedly attempt to sell (and have sold) competing Biomet products to the same surgeons and medical facilities with which each had relationships with for Stryker.

127.    Biomet's decision to hire Ridgeway and Steitzer in Southeast Louisiana and Albany, respectively, poses harm to Stryker far beyond just significant monetary losses.

128.    Biomet will have (and has gained) an unfair advantage in targeting Stryker's customers and developing marketing plans and campaigns based on Stryker's successes and rejected plans.  Defendants will have valuable know-how on how to design and improve Biomet's own products, customer relationships, and goodwill.

129.    Ridgeway and Steitzer cannot perform their jobs for Biomet without violating their Agreements and Confidentiality Agreements and without using Stryker's trade secrets and confidential information.

130.    Ridgeway and Biomet's activities have resulted in the South Louisiana branch being well below its required quota and having a negative growth, costing Stryker potentially millions of dollars in business.

131.    Steitzer and Biomet's activities have resulted in business loss in the Albany

region, loss of goodwill with Stryker's customers, loss of the value of Stryker's trade secrets, and will and have cost Stryker potentially millions of dollars in business.

132.    All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Stryker, including the loss of value of confidential and/or proprietary information, the loss of long-standing customer relationships, loss of goodwill, as well as damage to Stryker's reputation as an industry leader and its ability to successfully market its goods and services.  Money alone cannot make Stryker whole.

## COUNT I
## BREACH OF CONTRACT
### (Against Ridgeway)

133.    Stryker hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 139.

134.    The Agreement that Ridgeway entered into with Stryker constitutes a valid and enforceable contract.

135.    Stryker performed all of the duties and obligations it agreed to and owed Ridgeway under his Agreement.

136.    The Agreement required and requires Ridgeway not to solicit Stryker's customers, engage in competitive behavior against Stryker, or solicit Stryker's employees. (Agreement at § 1.)

137.    In breach of the Agreement, Ridgeway has and continues to solicit Stryker's customers on behalf of Biomet.

138.    In further breach of the Agreement, Ridgeway is competing against Stryker through his employment with Biomet.

139.    In further breach of the Agreement, Ridgeway solicited Stryker's employees for

16210651v.1

employment with Biomet, including Border and Green.

140.    The Confidentiality Agreement required, and requires, Ridgeway to "hold in confidence and not to disclose any and all Confidential and Proprietary Information, Inventions, and Copyrightable Works without approval or authorization from Stryker." *See* Confidentiality Agreement, ¶ 2.

141.    By sharing Stryker's confidential information, and using that information for the benefit of Biomet and himself, Ridgeway breached, and continues to breach, his contractual obligations owed to Stryker.

142.    As a result of Ridgeway's breaches, Stryker has been irreparably injured, and it continues to face irreparable injury.  Stryker is threatened with losing the value of its confidential and proprietary information and certain customer relationships, along with income and goodwill, for which a remedy at law is inadequate.

143.    Accordingly, Ridgeway must be enjoined and restrained by Order of this Court. To the extent a remedy at equity is adequate, Stryker seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and interest.

## COUNT II
## BREACH OF CONTRACT
### (Against Steitzer)

144.    Stryker hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 139.

145.    The Agreement that Steitzer entered into with Stryker constitutes a valid and enforceable contract.

146.    Stryker performed all of the duties and obligations it agreed to and owed Steitzer under his Agreement.

147.    The Agreement required and requires Steitzer not to solicit Stryker's customers, engage in competitive behavior against Stryker, or solicit Stryker's employees.  (Agreement at § 1.)

148.    In breach of the Agreement, Steitzer has and continues to solicit Stryker's customers on behalf of Biomet.

149.    In further breach of the Agreement, Steitzer is competing against Stryker through his employment with Biomet.

150.    The Confidentiality Agreement required, and requires, Steitzer to "hold in confidence and not to disclose any and all Confidential and Proprietary Information, Inventions, and Copyrightable Works without approval or authorization from Stryker." *See* Confidentiality Agreement, ¶ 2.

151.    By sharing Stryker's confidential information, and using that information for the benefit of Biomet, Steitzer breached, and continues to breach, his contractual obligations owed to Stryker.

152.    As a result of Steitzer's breaches, Stryker has been irreparably injured, and it continues to face irreparable injury.  Stryker is threatened with losing the value of its confidential and proprietary information and certain customer relationships, along with income and goodwill, for which a remedy at law is inadequate.

153.    Accordingly, Steitzer must be enjoined and restrained by Order of this Court.  To the extent a remedy at equity is adequate, Stryker seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and interest.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (Against Ridgeway)

154.    Stryker hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 139.

155.    As an employee and District Manager, Ridgeway had a duty to act in good faith and solely for the benefit of Stryker in all matters within the scope of his employment.

156.    Ridgeway's fiduciary duties included (but were not limited to): (1) the duty to guard and not misuse confidential and proprietary information of Stryker; (2) to devote best efforts to the business of Stryker; (3) to not operate a related business while employed by Stryker; and (4) to not interfere with or usurp business opportunities belonging to Stryker.

157.    Ridgeway breached his fiduciary duties to Stryker by, among other things: (1) failing to protect the interests of Stryker; (2) misusing Stryker's confidential and proprietary information; (3) operating a separate, but related, medical business while employed by Stryker; (4) inflating Stryker sales for his personal benefit and to the detriment of Stryker; and (5) interfering with and usurping Stryker's business opportunities.

158.    Stryker has been and continues to be damaged by Ridgeway's wrongful conduct.

159.    As a result of Ridgeway's actions, Stryker has suffered damages in an amount to be determined at trial, and because its remedy at law may be inadequate or incomplete, seeks preliminary and permanent injunctive relief to recover and protect its property.

160.    Because Ridgeway's actions have been willful, malicious, outrageous, oppressive, or done in complete disregard of the consequences they might have upon Stryker, the award of exemplary and punitive damages in an amount proven at trial is proper.

29

## COUNT IV
## ACTUAL AND/OR THREATENED MISAPPROPRIATION OF TRADE SECRETS
## (MICHIGAN UNIFORM TRADE SECRET ACT, MICH. COMP. LAWS § 445.1901)
### (Against All Defendants)

161.    Stryker hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 139.

162.    Stryker's confidential and proprietary information includes, *inter alia*, Stryker's operations, products, pricing formulae, manufacturing processes, research and development activities, efficacy testing, analysis of competitive products, research and development efforts, marketing plans, business plans, and business strategies; and customers, including, but not limited to, customer lists, customer preferences, strategies for soliciting prospective customers, pricing and creative financing information, analytical results of competitive product comparisons, customer marketing data and purchasing patterns, applicable discount codes and planned research and development for its customer base.

163.    This information constitutes trade secrets, pursuant to the Michigan Uniform Trade Secret Act, MICH COMP. LAWS § 445.1901, *et seq.*, because Stryker derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

164.    Ridgeway and Steitzer actually misappropriated and/or threaten to inevitably misappropriate Stryker's trade secrets without its consent, in violation of Michigan law.  Biomet cannot hire Stryker's employees, including Ridgeway and Steitzer, into similar positions at Biomet without Defendants utilizing and disclosing Stryker's confidential information.

165.    Defendants will be or are being unjustly enriched by the misappropriation of

16210651v.1

Stryker's trade secrets and/or confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate its trade secrets and confidential information.

166.   Defendants' actual and/or threatened misappropriation has been willful and malicious.  Further, Ridgeway and Steitzer took deliberate and repeated steps to hide their activities to move Stryker's business from Stryker to Biomet and to deceive Stryker, and both violated their Agreements by retaining and/or utilizing Stryker's secrets and confidential information after their respective terminations and refusing to return such confidential information upon its demand.

167.   As a result of the threatened and/or actual misappropriation of Stryker's trade secrets, it has been injured and faces irreparable injury.  Stryker is threatened with losing customers, its trade secrets and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of this Court.

### COUNT V
### TORTIOUS INTERFERENCE WITH CONTRACT
#### (Against Biomet)

168.   Stryker hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 139.

169.   As set forth above, each of Ridgeway's and Steitzer's Agreements and Confidentiality Agreements are valid and enforceable contracts.  The post-employment activity covenants, confidentiality covenants and other provisions contained in the Agreement and Confidentiality Agreement are reasonable in scope and duration and are reasonably necessary to protect Stryker's legitimate protectable interests in its long-standing, well-established and valuable customer relationships and its confidential information, as well as its goodwill.

31

170.    Biomet was fully aware of the Agreement and Confidentiality Agreement prior to hiring both Ridgeway and Steitzer.

171.    Despite having knowledge of the Agreement and Confidentiality Agreement, Biomet intentionally induced, permitted or incentivized Ridgeway and Steitzer to violate the post-employment and contractual obligations owing to Stryker, without justification, in an effort to employ each of them, move Stryker's customers and workforce, and/or unfairly compete with Stryker.

172.    Stryker believes Biomet's intentional interference was willful, malicious, unjustified and accomplished through wrongful means, including but not limited to, inducing, aiding or abetting Ridgeway and Steitzer to each breach his contract with Stryker and otherwise violate the law.

173.    Biomet's interference with the Agreement and Confidentiality Agreement are separate and apart from, and unrelated to, its threatened and/or actual misappropriation of Stryker's trade secrets.

174.    As a result of Biomet's intentional interference, Stryker has suffered irreparable and other significant injuries.

## PRAYER FOR RELIEF

WHEREFORE, Stryker Corporation and Howmedica Osteonics Corp. seek judgment in their favor and an Order against Defendants that grants the following relief:

A.      Preliminarily and permanently enjoining Defendants Christopher Ridgeway, Richard Steitzer, Biomet, Inc., and all parties in active concert or participation with them, from using or disclosing any of Stryker's confidential and/or proprietary information;

B.      Preliminarily and permanently enjoining Defendants Christopher Ridgeway and Richard Steitzer from engaging in or participating in any employment or activity competitive with Stryker on Biomet's behalf, insomuch as such activity is

32

directed to or designed to solicit or divert any of Stryker's customers and/or any customers that Ridgeway or Steitzer contacted, targeted as a potential prospect or serviced while in Stryker's employ.

C.     Preliminarily and permanently enjoining Defendants Christopher Ridgeway and Biomet, Inc., and all parties in active concert or participation with them, from contacting, soliciting, diverting, continuing to service any Stryker's customers diverted from Stryker to Biomet directly or indirectly from the efforts of Ridgeway and/or Biomet, and/or continuing to attempt to contact, solicit, divert or service any Stryker's customers;

D.     Ordering Defendants Christopher Ridgeway, Richard Steitzer, Biomet, Inc., and all parties in active concert or participation with them, to return to Stryker all originals and copies of all files, devices and/or documents that contain or relate to Stryker's confidential and proprietary information, including without limitation, all computers, electronic media, PDA's and electronic storage devices;

E.     Ordering Defendants Chris Ridgeway, Richard Steitzer, Biomet, Inc., and all parties in active concert or participation with them, to preserve all documents, data, and electronic information and to produce for inspection and imaging all computers and other electronic storage devices and email accounts belonging to, under the control of, accessible to, or operated by Ridgeway and/or Steitzer;

F.     Awarding Stryker actual, incidental, compensatory, and consequential damages to be proven at trial;

G.     Awarding Stryker exemplary or punitive damages in an amount to be proven at trial due to Defendants' willful and malicious activities;

H.     Awarding Stryker their costs and expenses incurred herein, including reasonable attorneys' fees and interest, pursuant to Michigan Uniform Trade Secret Act, MICH COMP. LAWS § 445.1901, *et seq.*;

I.     Awarding Stryker all sums disgorged from Ridgeway and Biomet, based on Ridgeway's breach of his fiduciary duty to Stryker; and

J.     Awarding Stryker such further relief as the Court deems necessary and just.

**DATED:  SEPTEMBER 30 , 2013**                    Respectfully submitted,

                                                  **STRYKER CORPORATION and
                                                  HOWMEDICA OSTEONICS CORP.**


                                                  By: /s/ Jason P. Stiehl _____
                                                              One of Their Attorneys

Craig H. Lubben
David J. Gass
MILLER, JOHNSON, SNELL & CUMMISKEY, P.L.C.
100 West Michigan Avenue, Suite 200
Kalamazoo, Michigan 49007
Telephone: (269) 226-2958
Facsimile:  (269) 978-2958

Michael D. Wexler
Jason P. Stiehl
Justin K. Beyer
Seyfarth Shaw LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois  60603
Telephone:  (312) 460-5000
Facsimile:  (312) 460-7000

*Attorneys for Plaintiffs Stryker Corporation and
Howmedica Osteonics Corp.*

16210651v.1