UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STRYKER CORPORATION, et al.,

        Plaintiffs,

                                         Case No.  1:13-CV-1066

v.

                                         HON. ROBERT HOLMES BELL

CHRISTOPHER RIDGEWAY, et al.,

        Defendants.

and

STONE SURGICAL, LLC,

        Plaintiff,

v.                                         Case No. 1:14-CV-889

STRYKER CORPORATION, et al.,

        Defendants.

_____/


## **O P I N I O N**

    This matter is before the Court on Plaintiffs Stryker Corporation and Howmedica

Osteonics Corporation's (collectively "Stryker")[1] motion for partial summary judgment on

---

[1]Ridgeway periodically objects to the Plaintiffs' failure to distinguish between the two corporations.  Because there are questions of fact regarding the  extent to which the two plaintiffs had overlapping or identical interests with respect to Ridgeway, the Court will continue to refer to them collectively as "Stryker" for purposes of this motion.

their breach of contract, breach of fiduciary duty, and misappropriation of trade secret claims against Defendant Christopher Ridgeway  (Counts I, III and V of the amended complaint), and on Defendant Ridgeway's cross-motions for partial summary judgment on Plaintiffs' misappropriation of trade secrets and breach of fiduciary duty claims.  (ECF Nos. 345, 350, 358.)  For the reasons that follow, the motions will be denied.

## I.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the moving party carries its burden of showing there is an absence of evidence to support a claim, then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  Where the moving party bears the ultimate burden of persuasion at trial, "the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'"  *Cockrell v. Shelby County School Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) (quoting 11 James William Moore et al., Moore's Federal Practice § 56.13[1], at 56-138 (3d ed. 2000)).

In reviewing a motion for summary judgment this Court cannot weigh the evidence, make credibility determinations, or resolve material factual disputes. *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (stating that on a motion for summary judgment "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). "Instead, the evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569-70 (6th Cir. 2012) (citing *Matsushita*, 475 U.S. at 587; *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Liberty Lobby*, 477 U.S. at 252. The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

## II.

Stryker moves for summary judgment on its Count I breach of contract claim based on its assertion that no questions of material fact exist that Ridgeway entered into the non-compete agreement and the confidentiality agreement attached to Plaintiffs' amended complaint and that he executed and breached both of these agreements.

### A. Non-Compete Agreement

As a preliminary matter, Ridgeway contends that Louisiana law applies to the breach of contract claim against Howmedica Osteonics because Howmedica Osteonics is a New

Jersey corporation, and Michigan accordingly has no interest in applying its law to contract claims against Howmedica Osteonics.

What law applies will largely depend on whether the Court finds that Ridgeway was a party to the non-compete agreement, because that agreement contains a Michigan choice-of-law provision. In addition, because Ridgeway was employed by Stryker CMF, a division of Howmedica Osteonics that is headquartered in Portage, Michigan (Mercado Supp. Decl., Dkt. 50-2, ¶5), the Court is not prepared to find that Michigan does not have an interest in the breach of contract claim against Ridgeway.

Issues surrounding the non-compete agreement have been addressed in an earlier opinion. The Court has already found, in conjunction with Stryker's motion for summary judgment on Ridgeway's counterclaims, that there are questions of fact as to the existence and terms of the non-compete agreement. (Dec. 1, 2015, Op. 4-7, ECF No. 433.) The evidence submitted in support of the present motion does not change this Court's earlier determination that there are questions of fact for trial regarding the existence and terms of the non-compete agreement. Because the existence and terms of the non-compete agreement are in dispute, the Court will not address whether there was a breach of the alleged non-compete agreement. Accordingly, Stryker's motion will be denied as to the breach of contract claim to the extent it relies on the non-compete agreement.

**B. Confidentiality Agreement**

Stryker's breach of contract claim in Count I is premised not only on breaches of a non-compete agreement, but also on breaches of the confidentiality agreement. Ridgeway

4

does not deny that he signed the confidentiality agreement. (Ridgeway Ans. ¶ 69, ECF No. 76.) This agreement contains a Michigan choice of law provision. (Confidentiality Agreement ¶ 7.) Accordingly, the Court will proceed to analyze Stryker's assertion that it is entitled to judgment on its claim that Ridgeway breached the confidentiality agreement, and the Court will apply Michigan law to this analysis.

Through the confidentiality agreement Ridgeway agreed "to hold in confidence and not to disclose any and all Confidential and Proprietary Information, Inventions, and Copyrightable Works without approval or authorization from Stryker." (Confidentiality Agreement ¶ 2, ECF No. 23-4; Am. Compl. ¶ 71, ECF No. 23.) He also agreed that upon termination of his employment he would "return to Stryker any and all information and material relating to Stryker's business, products, personnel or customers, whether or not such material is deemed to be confidential or proprietary. Thereafter, any continued possession will be deemed to be unauthorized." (Am. Compl ¶ 72; Confidentiality Agreement ¶ 4(a).) Stryker has presented substantial evidence that it considers its pricing, customer preferences, par levels, and employee information to be confidential and proprietary information. (*See*, *e.g.*, Barnette Decl. ¶ 12, ECF No. 346-1.)

The evidence is undisputed that Ridgeway disclosed a customer's preference for Stryker's locking mechanism, and Biomet's need for a larger tray to hold implants to Biomet, and what sets Ridgeway would need if he joined Biomet. (Border Dep. 9, 16, 19; Lewis Dep. 162; Ridgeway Dep. 141, 147.) Whether these disclosures were material enough to constitute a breach of the confidentiality agreement presents a question of fact for trial. To

the extent Stryker asserts that Ridgeway provided a locking plate for Biomet to copy and a list of how many sets Stryker had at each hospital, and a list of Stryker's contacts at each hospital, these assertions are based on evidence that Ridgeway asked Border to prepare this information for Biomet. (Ridgeway text to Border, ECF No. 346-22.) There is a question of fact as to whether the information was in fact provided to Biomet.

In sum, while Stryker has presented unrebutted evidence of a breach of the confidentiality agreement, Stryker has not focused its argument on this breach, and much of the evidence is inconclusive. The Court is not convinced that a reasonable jury would have to find a breach of the confidentiality agreement. Accordingly, the Court will deny Stryker's motion for summary judgment on its breach of contract claim, both as to the non-compete agreement and the confidentiality agreement.

## III.

Stryker has moved for summary judgment in its favor on its breach of fiduciary duty claim in Count III of its Amended Complaint. Ridgeway has filed a cross-motion[2] for summary judgment on the fiduciary duty claim based on his contention that he did not owe Stryker a fiduciary duty and, if he did, he did not breach any fiduciary duty. (Ridgeway Mot. for Partial SJ, ECF No. 326; Ridgeway Mot. for SJ as to Fiduciary Duty Claim, ECF No. 358.) This Court previously denied Ridgeway's motion for partial summary judgment on the

---

[2]Summary judgment is not necessarily appropriate simply because the parties have filed cross-motions for summary judgment. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001).

issue of whether Ridgeway owed Stryker Corporation or Howmedica Osteonics a fiduciary duty. (Nov. 19, 2015, Op. 190-12, ECF No. 427.) The Court must still address Stryker's affirmative motion on the fiduciary duty claim and Ridgeway's motion for summary judgment on that claim due to the lack of evidence of breach or damages.

The elements of a fiduciary duty claim are (1) the existence of a fiduciary duty, (2) a breach of that duty, (3) proximately causing damages. *Stephens v. Dixon*, 536 N.W.2d 755, 758 (Mich. 1995); *Pagliara v. Johnston Barton Proctor & Rose, LLP*, 708 F.3d 813, 818 (6th Cir. 2013) (Tennessee law); *Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*, 530 F. App'x 542, 545 (6th Cir. 2013) (Ohio law).

Under Michigan law, fiduciary duties arise "'out of the relation subsisting between two persons of such a character that each must repose trust and confidence in the other and must exercise a corresponding degree of fairness and good faith.'" *Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612, 632 (E.D. Mich. 2005) (quoting *Portage Aluminum Co. v. Kentwood Nat'l Bank*, 307 N.W.2d 761, 763 (Mich. Ct. App. 1981)); *see also Smith v. Saginaw Sav. & Loan Ass'n*, 288 N.W.2d 613, 618 (Mich. Ct. App. 1979) ("A fiduciary relationship exists when there is a reposing of faith, confidence and trust and the placing of reliance by one upon the judgment and advice of another."). To prevail on a breach of a fiduciary duty claim, a plaintiff must show that the "'position of influence has been acquired and abused," or the "confidence has been reposed and betrayed." *Vicencio v. Ramirez*, 536 N.W.2d 280, 284 (Mich. Ct. App. 1995)). *Id.* The general rule is that the employer-employee relationship does **not** give rise to a fiduciary relationship unless the employee is

a high-level employee, or if there is a specific agency relationship. *Dana Ltd. v. Am. Axle & Mfg. Holdings, Inc*., No. 1:10-CV-450, 2012 WL 2524008, at *12 (W.D. Mich. June 29, 2012) (Bell, J.)

Stryker bases its fiduciary duty claim on its assertion that Ridgeway acted as an agent for both Stryker Corporation and for Howmedica Osteonics. Stryker contends that Ridgeway was an agent of Stryker Corporation because he was responsible for Stryker's Neuro Spine ENT ("NSE") business, which is a division of Stryker Corporation. (Mercado Decl. ¶ 17, ECF No. 8-1.) Stryker has also presented evidence that, in that capacity, Ridgeway was responsible for marketing and selling Stryker's NSE products, cultivating and growing relationships with surgeons and hospitals, negotiating with customers on Stryker NSE's behalf, and recruiting and training new Stryker NSE sales representatives. (Mercado Decl. ¶ 17; Ridgeway Dep. 93, 270-75; Ridgeway 10/16/2012 email, ECF No. 376-6.)

Stryker has presented evidence that as a sales representative for Stryker CMF, a division of Howmedica Osteonics, Ridgeway was responsible for cultivating relationships with surgeons, providing technical product information, coordinating training on Stryker CMF products, providing technical assistance, and generally acting as the face of Stryker to its clients. (Mercado Decl. ¶ 9, ECF No. 8-1.) When Ridgeway became a district sales manager, he assumed greater responsibilities, including recruiting and training new sales representatives, developing and implementing strategies to maximize sales in his territory, and helping to negotiate sales, pricing, and contracts with customers. (Krupinski Dep. ¶ 11,

ECF No. 8-1; Ridgeway Dep. 277-79; Ridgeway 10/16/2012 email, ECF No. 376-6.)

Ridgeway contends that these actions were not sufficient to create a fiduciary relationship. He contends he owed Stryker Corporation no fiduciary duty because he was never employed by Stryker Corporation. As to Howmedica Osteonics, he contends he owed no fiduciary duty because he was a salesman who never attained the status of a high-level officer.

Even though Ridgeway was not employed by Stryker Corporation, it is possible for a fiduciary relationship to be created outside the employment relationship. In this case there is sufficient evidence to suggest that Ridgeway's relationship to Stryker in his capacity as an NSE salesman gave rise to a fiduciary relationship. The evidence is not so powerful, however, as to suggest that no reasonable jury would be free to disbelieve it.

In *Dana* this Court granted summary judgment in favor of employees on a fiduciary duty claim because the employees were "middle level employees," there was no evidence that they were "high level executives or key designers of the company's strategic plans and operations," and the plaintiff had not provided specific facts regarding an agency relationship. 2012 WL 2524008, at *12. Ridgeway contends that Stryker is not entitled to summary judgment on the issue of fiduciary duty because, like the Dana employees, Ridgeway was not a high level officer and Stryker has presented no evidence that he actually served in a capacity under which a fiduciary duty was owed.

There is ample precedent for finding a sales representative to be a fiduciary. *See*, *e.g.*, *Hennegan Co. v. Arriola*, 855 F. Supp. 2d 1354, 1362 (S.D. Fla. 2012) (holding that proofs failed to establish a breach of the salesman's fiduciary duty of loyalty); *Molex, Inc. v. Nolen*, 759 F.2d 474, 479 (5th Cir. 1985) (holding, under Texas law, that sales representative had a fiduciary relationship with his employer); *Prudential Ins. Co. v. Eslick*, 586 F. Supp. 763, 764 (S.D. Ohio 1984) (holding that there was a factual issue as to whether life insurance salesman had a fiduciary relationship with insurance company employer).

Ridgeway does not respond to Stryker's evidence that Ridgeway acted as an agent for Stryker in his dealings with the hospitals and surgeons in his sales territory. He also ignores the differences between his employment and the employment of the Dana engineers. In contrast to the Dana engineers who worked in-house for Dana, Stryker has presented evidence that Ridgeway had apparent and actual authority to conduct business on Stryker's behalf; he was the liaison between Stryker and its key customers and acted effectively as the face of Stryker to its clients (Mercado Decl. ¶¶ 9, 17, ECF No. 8-1.) Ridgeway had authority on behalf of Stryker CMF to negotiate prices, offer discounts on products, solicit and negotiate contracts with hospitals, and manage day-to-day interactions with hospitals and surgeons in his territory. (Barnette Decl. ¶ 27.)

Ridgeway has presented little evidence in support of his assertion that he did not owe Stryker a fiduciary duty. Nevertheless, because Stryker is seeking summary judgment on a claim on which it bears the burden of proof, because fiduciary relationships are the exception

10

rather than the rule in employer-employee relationships, the Court is not prepared to find, on this record, that the evidence of a fiduciary relationship is so powerful that no reasonable jury would be free to disbelieve it.

Because the Court finds that Stryker is not entitled to summary judgment on its claim that Ridgeway owed Stryker a fiduciary duty, the Court need not address Stryker's request for summary judgment on its claim that Ridgeway breached that fiduciary duty. The Court turns instead to Ridgeway's contention that he is entitled to judgment on Stryker's fiduciary duty claim because he did **not** breach that fiduciary duty.

**Breaches of fiduciary duty**

Ridgeway moves for summary judgment as to Stryker's claim that a breach of fiduciary duty occurred. Stryker opposes Ridgeway's motion for summary judgment based on its contention that it has presented sufficient evidence that Ridgeway, while acting as an agent for Stryker, breached his fiduciary duties (1) by violating Stryker's prohibition against having a side business; (2) by providing Stryker's confidential pricing and doctor preference data to Biomet while he was still employed by Stryker; (3) by not hiring candidates for Stryker that he intended to hire for Biomet; and (4) by overselling product to Our Lady of the Lake Hospital ("OLOL"). (Stryker Resp. 1, ECF No. 396.)

1. <u>Side Businesses</u>

Ridgeway contends that Stryker cannot prevail on its contention that Ridgeway's side businesses constituted a breach of any fiduciary relationship. Ridgeway admits that while

he was employed by Stryker he also sold product for OsteoSymbionics and Bacterin, and genetic services through Natural Molecular. (Ridgeway Dep. 303-04.) Ridgeway contends, however, that his side businesses were authorized. He has presented evidence that Stryker allowed all of its salespeople to sell products for OsteoSymbionics. (Van Vleet Dep. 13.) He has presented evidence that he spoke openly with his supervisors about his side businesses, and that they did not object. (Ridgeway Dep. 327-28, ECF No. 346-19.) He has also presented an email from his boss, Jason Barnette, stating that he saw no conflict of interest with respect to Ridgeway's distribution agreement with Natural Molecular. (Barnette 12/7/2012 email, ECF No. 360-16.)

Stryker contends that side businesses were prohibited by its Code of Conduct unless authorized by Stryker. Elizabeth Anderson-Kline, Senior Compliance Training Analyst at Stryker, has attached the Code of Conduct that was used by Stryker from March 1997 to June 2006. (Kline-Anderson Decl. ¶ 6, ECF No. 396-1.) She has also attached the current Code and evidence that Ridgeway completed the 2012 refresher course on his obligations under the Code. (*Id.* at ¶ 17.) The Code requires employees to disclose any actual or potential conflict of interest. A conflict is defined to include any outside position or activity that affects the performance of the employee's work for the Company. (*Id.* at Ex. A ¶ 10, Ex. B ¶ 12.) Stryker has presented evidence that Ridgeway's 2012 compensation plan specifically provided that he "must not engage in any side businesses that will distract you from your primary responsibilities as a Stryker employee or places you in a potential conflict of interest

with Stryker." (Panos Decl. ¶ 6, ECF No. 396-15.) Pursuant to this policy he was required to fill out a conflict of interest form before Stryker would sanction a side business. (Cameron Dep. 372-74.) When Barnette advised that he did not see a conflict of interest in Ridgeway's distribution agreement with Natural Molecular, he also indicated that he was not in a position to make a conflicts determination, and he sent Ridgeway a conflict of interest form so that it would be known by those in Stryker who made those decisions. (Barnette email, ECF No. 360-16.)

In response, Ridgeway contends that the Code of Conduct is not competent evidence because Stryker has not provided a Code of Conduct signed by Ridgeway. The lack of a signed Code is not significant because the Confidentiality Agreement, which Ridgeway admits signing, provides that "Employee acknowledges receipt of Stryker Corporation's Code of Conduct," that he has read and understands it, that he agrees to abide by it, and that his compliance is a condition of his continued employment. (Confidentiality Agreement ¶ 5.) Moreover, there is ample evidence that Ridgeway signed off on annual refresher courses on the Code of Conduct.

Ridgeway contends, in any event, that his side businesses did not violate the Code because they did not compete with Stryker and they did not impair Ridgeway's performance for Stryker. In support of this assertion, Ridgeway cites to evidence that he grew sales in his territory from $60,000 in 2001 to $9 million in 2011, and that he won many awards for his work at Stryker, including top sales representative of the year. (Mercado Dep. 17, ECF 360-

13.)  He also points to evidence that he received stellar reviews for his work and his ethical behavior while at Stryker.  (Aug 2012 evaluation, ECF No. 360-5; Steed email, ECF No. 360-9; 360-Degree Feedback, ECF No. 360-10.)

Based on the conflicting evidence presented, it is clear that there are questions of fact as to whether Ridgeway's supervisors knew about and condoned his side businesses, whether his side businesses distracted him from his primary responsibilities as a Stryker employee, and whether his side businesses constituted a conflict of interest with his work for Stryker.

2.  Confidential Information

Ridgeway contends that he did not take confidential and proprietary information from Stryker when he left, and he did not use confidential information for making any sales on behalf of Biomet.  He also contends that others who left Stryker were not asked to return any sales data stored in their computers.  (Cruikshank Dep. 167, ECF No. 360-2; Green Dep. 158-59, ECF No. 360-3.)

Ridgeway's assertions are not responsive to Stryker's allegations.  For purposes of its fiduciary duty claim, Stryker is not concerned about sales made on behalf of Biomet, but with Ridgeway's disclosure of confidential pricing and doctor preference data to Biomet while Rideway was still employed by Stryker.  Stryker has offered testimony that the pricing and doctor preference data, which Ridgeway helped to create, was not readily available to new entrants to the market, and that disclosure of the information would hurt Stryker.  (*See*, *e.g*., Cameron Dep. 126, ECF 346-13; Cameron Dep. 212, ECF No. 376-2 ; Cruikshank Dep. 185-

87, ECF 346-3.)  Accordingly, Stryker contends that Ridgeway was required to keep the information confidential and use it only on Stryker's behalf.

Stryker  has presented evidence that, in violation of his fiduciary duties, Ridgeway: told Biomet that one of his surgeons liked Stryker's locking mechanism; offered to obtain a locking plate for Biomet so that they could create their own locking mechanism; disclosed to Biomet that its tray would not hold enough implants; told Biomet that Stryker's customers preferred screws in a disc; and discussed sets and tray quantities Ridgeway would need to work on behalf of Biomet.  (Border Dep. at 9, 16, 19, ECF 346-20; P. Lewis 3/25/2015 Dep. 134-36, 140-151, 162, ECF No. 346-14; Ridgeway Dep. 141, 170-72, 239-40, ECF No. 346-19; 8/4/2013 email, ECF No. 346-26.)  Stryker contends that these actions conflicted with Ridgeway's fiduciary obligations to Stryker.

Stryker has also provided evidence of the steps it took to maintain the confidentiality of the information, including the non-compete and confidentiality agreements signed by sales representatives, the code of conduct, yearly training on confidential information, pass codes for computers, and requirements that customers maintain the confidentiality of Stryker's information.

Stryker's evidence is sufficient to create an issue of fact for trial as to whether Ridgeway disclosed confidential information while he was employed by Stryker.

3. Failing to Hire

Ridgeway contends that he did not fail to hire qualified candidates for Stryker.  He has

presented evidence that his bosses agreed that the last six candidates before Ridgeway's termination were not qualified. (Steed email, ECF No. 360-24.)

Stryker has presented evidence that Ridgeway passed up at least two qualified candidates for Stryker because he wanted to keep them for Biomet. (Border Dep. 58-60.) This evidence is sufficient to create an issue of fact for trial.

4. OLOL

Ridgeway contends that there is no competent evidence that he tricked OLOL into ordering excessive products. Ridgeway contends that Stryker has not produced a single witness with personal knowledge that Ridgeway engaged in any fraudulent conduct. OLOL's corporate representative testified that she never saw Ridgeway fraudulently manipulating the billing process, tricking the hospital into ordering excess product, or disposing of product to hide his scheme. (Blouin Dep. 55-56, ECF No. 360-6.) She also testified that the hospital ordered the products, and that Ridgeway could not order products for the hospital. (Blouin Dep. 117, ECF No. 360-6.) In addition, Ridgeway notes that he was not even the sales representative for OLOL in the years before his termination. He simply oversaw Border and Cruikshank who had the day-to-day responsibilities at the hospital. Ridgeway also contends that Jason Barnett, Ridgeway's regional manager, was aware of Billy Cruikshank's allegations of unethical conduct at OLOL, but did nothing about it. (Cruikshank Dep. 199-200, ECF No. 396-18.) Finally, Ridgeway contends that it was impossible for him to have overstocked inventory at OLOL because the inventory was on

consignment, and was not purchased until it was used. (Consignment Agreements, ECF Nos. 363-17, -18, -19.)

Stryker has presented evidence that it heard from Cruikshank, a former sales representative, that Ridgeway had been overpurchasing screws at OLOL, and that Ridgeway had directed Cruikshank to assist him in hiding the level of overstocking. (Barnette Decl. ¶ 47, ECF No. 346-1; Cruikshank Dep. 72-82, ECF No. 346-3.) In its investigation, Stryker discovered 80 screw disks on the Stryker cart at OLOL, even though hospitals typically stocked only 2-4 disks at a time. (Barnette Decl. ¶ 50, ECF No. 346-1.) OLOL personnel advised Stryker that Ridgeway was responsible for telling OLOL employees what product needed to be ordered. (Barnette Decl. ¶ 53.) This evidence, viewed in the light most favorable to Stryker, is sufficient to support an inference that Ridgeway engaged in conduct at OLOL that conflicted with his obligations to Stryker. Accordingly, there are issues of fact for trial regarding breach of a fiduciary duty based on overstocking at OLOL.

5. Damages

Ridgeway also seeks summary judgment on Stryker's fiduciary duty claim based on his contention that Stryker cannot demonstrate that any alleged breach of fiduciary duty caused any damages to Stryker. Although Ridgeway acknowledges that Stryker has some evidence of a decline in sales in 2013, Ridgeway contends that Stryker cannot show that they were attributable to Ridgeway, as opposed to a normal fluctuation. Moreover, he contends that there is conflicting evidence showing an actual increase in sales from 2012 (ECF No.

360-12.)  In addition, on August 1, 2013, less than two months before his termination, Ridgeway's boss, Jason Barnette, told him he had a good finish for the month of July. (Barnette email, ECF No. 360-14.)  Finally, he contends that Stryker mitigated any sales decrease because its sales increased in the New Orleans territory from 2013 to 2014.

Stryker has presented sufficient evidence to support an inference that it was damaged by, among other things, Ridgeway's disclosure of information to Biomet, his expenditure of time on side businesses, his receipt of commissions and awards for which he was not entitled, and his overstocking at OLOL.  The amount of damages is a question of fact for trial. *Schwarz Pharma, Inc.*, 123 F. App'x 641, 648 (6th Cir. 2005) ("questions raised concerning damages are essentially questions of fact").

Viewing the facts in the light most favorable to Stryker, Ridgeway is not entitled to summary judgment on Stryker's breach of fiduciary duty claim.  Although  Ridgeway has presented evidence challenging some of the factual assertions presented by Stryker, his evidence does not nullify the evidence presented by Stryker.  Whether or not Ridgeway breached a fiduciary duty owed to Stryker is a question of fact for trial.  Accordingly, Ridgeway's motion for summary judgment on Stryker's breach of fiduciary duty claim will be denied.

## IV.

### D.  Misappropriation of Trade Secrets

Stryker seeks summary judgment against Ridgeway on Count IV of its Amended

Complaint which alleges misappropriation of trade secrets in violation of the Michigan Uniform Trade Secrets Act ("MUTSA"), Mich. Comp. Laws § 445.1901 *et seq.* Ridgeway has filed a cross-motion for summary judgment on Stryker's MUTSA claim. (ECF No. 350.)

Ridgeway contends he is entitled to summary judgment on the MUTSA claim because Stryker cannot show that Ridgeway ever received any "trade secrets," that he ever acquired any trade secrets by improper means, that he ever disclosed any trade secrets, or that Stryker was damaged as a result of the loss of any trade secret. He also contends that the Michigan MUTSA statute does not apply to Howmedica Osteonics, and that he never had access to Stryker Corporation trade secrets.

1. Applicable Law

Ridgeway contends that Stryker cannot bring a Michigan misappropriation of trade secrets claim against Howmedica Osteonics because Howmedica Osteonics is a New Jersey corporation, Ridgeway worked for Howmedica in New Jersey, and Michigan accordingly has no interest in applying its law.

Ridgeway has not suggested that there is a meaningful difference between the misappropriation of trades secrets laws of Louisiana and Michigan. Where there is no conflict between the laws of two states, there is no need to undertake a choice-of-law analysis, and the Court applies the law of the forum state. *See New Hampshire Ins. Co. v. Carleton*, 502 F. App'x 478, 481 (6th Cir. 2012); *Williams v. Toys "R" Us*, 138 F. App'x

798, 803 (6th Cir. 2005). The Court will accordingly apply Michigan law to Howmedica Osteonics as well as to Stryker.

2. Stryker Corporation

Ridgeway contends that Stryker Corporation cannot show that he misappropriated trade secrets because he was not an employee of Stryker Corporation and did not have access to Stryker Corporation's trade secrets.

Even though Ridgeway was not employed by Stryker Corporation, Ridgeway's employer, Howmedica Osteonics, was a wholly owned subsidiary of Stryker Corporation. Ridgeway entered into a Confidentiality Agreement with "Stryker Corporation, including its subsidiaries, operating divisions, and affiliates." There are questions of fact for trial as to whether Stryker Corporation had a protectable interest in any information Ridgeway had access to and disclosed.

3. Receipt of Trade Secrets

Ridgeway contends he is entitled to judgment on Stryker's MUTSA claim because he was simply a salesman who was never furnished any technical, scientific, or secret manufacturing information.

MUTSA defines a "trade secret" as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

(i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws § 445.1902(d). In other words, "[i]nformation constitutes a protectable trade secret under MUTSA if the information derives independent economic value from not being generally known to others and the employer took reasonable steps to protect the confidentiality of the information." *Kelly Servs., Inc. v. Noretto*, 495 F. Supp. 2d 645, 658 (E.D. Mich. 2007) (citing Mich. Comp. Laws § 445.1902).

"[T]he essence of a trade secret is that it derives its value from secrecy." *Stromback v. New Line Cinema*, 384 F.3d 283, 305 (6th Cir. 2004). "Trade secrets do not 'encompass information which is readily ascertainable, i.e., capable of being acquired by competitors or the general public without undue difficulty of hardship.'" *PrimePay, LLC v. Barnes*, No. 14-11838, 2015 WL 2405702, at *21 (E.D. Mich. May 20, 2015) (quoting *Dura Global Techs., Inc. v. Magna Donnelly Corp.*, 662 F. Supp. 2d 855, 859 (E.D. Mich. 2009)). "[T]o be worthy of trade secret status, the secret information must afford the owner a competitive advantage by having value to the owner and potential competitors." *Daimler-Chrysler Servs. N. Am., LLC v. Summit Nat., Inc.*, 289 F. App'x 916, 922 (6th Cir. 2008).

Stryker asserts that its pricing, customer preferences, par levels, and employee information all constitute trade secrets under MUTSA because Stryker derives economic value from them and takes reasonable precautions to protect their confidentiality.

Ridgeway contends that the pricing information he was supplied by Stryker was not a trade secret because the information is disclosed to individuals outside of Stryker, including

21

the patient, the physician, the hospital staff, and the insurance company staff. Ridgeway further contends that none of these individuals is obliged to keep the pricing secret.

There is conflicting case law on whether pricing is a trade secret. Illinois courts[3] have consistently held that price information which is disclosed by a business to any of its customers does not constitute trade secret information protected by the Uniform Trade Secrets Act. *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.*, 616 F. Supp. 2d 805, 820 (N.D. Ill. 2009) (citing cases). Those courts reason that "[i]f competitor 'A' gives a customer an advantageous rate, it will not be long before the customer shops that rate around and tries to get competitor 'B' to go even lower; that is the nature of a competitive market." *Id.* (quoting *Trailer Leasing Co. v. Associates Commer. Corp.*, No. 96 C 2305, 1996 WL 450801, at *1 (N.D. Ill. Aug. 8 1996)).

Michigan courts, however, have generally recognized that pricing can be a trade secret. "An employer's 'pricing schemes, the details of its customer contacts, its markups, [and] employee information' are examples of possible 'trade secrets' under the MUTSA." *PrimePay, LLC v. Barnes*, No. 14-11838, 2015 WL 2405702, at *22 (E.D. Mich. May 20, 2015) (quoting *Kelly Servs., Inc. v. Greene*, 535 F. Supp. 2d 180, 187 (D. Me. 2008)

---

[3]Because MUTSA requires that the Act "be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of th[e] act among states enacting it," Mich. Comp. Laws § 445.1909, decisions of other jurisdictions have particular persuasive import. *Giasson Aerospace Sci., Inc. v. RCO Eng'g, Inc.*, 680 F. Supp. 2d 830, 840 n.5 (E.D. Mich. 2010).

(interpreting Michigan's trade secret act)). "Knowledge of vendors, vendor capabilities, and pricing can be a trade secret even if all of the information can be obtained through publicly available means so long as the information is not readily ascertainable." *Giasson Aerospace Sci., Inc. v. RCO Eng'g, Inc*., 680 F. Supp. 2d 830, 843 (E.D. Mich. 2010) (citing *Wysong*, 412 F. Supp. 2d at 630); *see also Kelly Servs. v. Eidnes*, 530 F. Supp. 2d 940, 951 (E.D. Mich. 2008) (suggesting that pricing schemes and details of customer contracts could constitute trade secrets); *Compuware Corp. v. Int'l Bus. Machines Corp*., No. 02-CV-70906, 2003 WL 23212863, at *7 (E.D. Mich. Dec. 19, 2003) ("Confidential information concerning customer preferences and pricing can be protectable as a trade secret.").

There is also some ambiguity in the case law as to whether customer preferences are trade secrets. Some Michigan courts have held that the knowledge a sales representative develops about each customer's business and peculiar needs is not protectable as a trade secret. *McKesson Med.-Surgical Inc. v. Micro Bio-Medics, Inc*., 266 F. Supp. 2d 590, 593-94 (E.D. Mich. 2003). "[C]ustomer identity, customer information, and customer lists, . . . although protectable by a confidentiality agreement, is not a trade secret under MUTSA." *Indus. Control Repair, Inc. v. McBroom Elec. Co.*, No. 302240, 2013 WL 5576336, at *7 (Mich. Ct. App. Oct. 10, 2013) (citing *McKesson*, 266 F Supp 2d at 594; *Hayes-Albion v. Kuberski*, 364 N.W.2d at 615 (applying the common law of trade secrets)). However, "[s]pecific information regarding resolution of the problems of particular customers is a trade secret." *Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 616 (Mich. 1984). Accordingly,

23

"[k]nowledge developed by an employee about how to address a particular customer's peculiar needs, or having developed solutions to specialized needs, can constitute a trade secret." *PrimePay*, 2015 WL 2405702, at *21; *Laethem Equip. Co. v. Deere & Co.*, No. 05-10113, 2007 WL 2433980, at *19 (E.D. Mich. Aug. 14, 2007) (holding that detailed information regarding customers, their needs, and their owners and employees can qualify as trade secrets).

It appears that the lack of consistency in the case law reflects the fact-intensive nature of the trade secret inquiry. Michigan courts consider six factors in deciding if information is a trade secret:

> (1) extent to which information is known outside of owner's business, (2) extent to which information is known by employees and others involved in business, (3) extent of measures taken to guard secrecy of information, (4) value of information to owners and competitors, (5) amount of effort and money expended in developing information, and (6) ease or difficulty with which information could be properly acquired or duplicated by other.

*Dura Glob. Techs., Inc. v. Magna Donnelly Corp.*, 662 F. Supp. 2d 855, 859 (E.D. Mich. 2009). Each one of these factors presents a question of fact. For example,

> Whether the measures taken by a trade secret owner are sufficient to satisfy the Act's reasonableness standard ordinarily is a question of fact for the jury. Indeed, we previously have recognized that "only in an extreme case can what is a 'reasonable' precaution be determined [as a matter of law], because the answer depends on a balancing of costs and benefits that will vary from case to case."

*Giasson*, 680 F. Supp. 2d at 840 (quoting *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003)). Accordingly, it is not sufficient to merely classify the

information as pricing or customer information, as application of these six factors may produce different results from case to case.

In support of his contention that pricing and doctor preferences are not trade secrets, Ridgeway has presented evidence that pricing is readily accessible through public records or freedom of information requests, at least with respect to government hospitals (Cruikshank Dep 133, ECF No. 352-10; P. Lewis Dep. 294-95, ECF No. 277-3); that the former Stryker sales representatives did not consider the pricing information given to them to be confidential (Mayfield Dep. 195-99, ECF No. 352-4; Cruikshank Dep. 133-34, ECF No. 352-10; Green Dep. 9-11, 21-23, 144-48, ECF No. 352-5); that sales representatives know the pricing and discount rates that are being offered by their competitors and their competitors' sales history (Green Dep. 9-10, 21-23); that hospitals, in an effort to get better prices, will voluntarily disclose prices charged and discount rates offered by competitors  (P. Lewis Dep. 293-94, ECF No. 277-3; Cruikshank Dep. 134, ECF No. 352-10; Green Dep. 22, ECF No.  352-5); that hospitals are not reluctant to reveal doctors' preferences to new vendors (Green Dep. 21, ECF No. 352-5); and that Stryker itself distributes the pricing information of its competitors to its sales people (Dura Substitute Competitive Guide, ECF No. 352-3).  Ridgeway has also produced evidence that when former sales representatives received information about pricing, promotional strategies, and equipment placement strategies from Stryker, they were not told that the information was confidential and could not be shared.  (Green Dep. 144-48, ECF No. 352-5; Mayfield Dep. 195-99.)   Ridgeway has also presented evidence that

hospitals were not required to sign a confidentiality agreement with Stryker. (Barker Dep. 28, 35, ECF No. 352-2.) Finally, Ridgeway has argued that pricing is so variable that there can be no economic advantage from keeping it secret. (*See* Baird Dep. 10-11, ECF No. 402-2) (noting that the pricing provided to an individual customer may be different from the public list price based on market share commitment, existing buy-in, or discounts).

In response, and in support of its contention that its pricing, customer preferences, par levels, and employee information all constitute trade secrets under MUTSA, Stryker relies on evidence that it has identified such information as trade secrets, and has protected it numerous ways. For example, it requires sales representatives to sign a non-compete agreement and a confidentiality agreement, and to adhere to the code of conduct. The non-compete agreement provides that the employee would be given access to: "confidential and trade secret information concerning . . . Company customers, including, but not limited to, customer lists; pricing information; analytical results of competitive product comparisons; customer marketing data and purchasing patterns; applicable discount codes; and planned research and development for its customer base and Employee's sales territory." (Non-Compete Agreement 1, ECF No. 23-2.) The Confidentiality Agreement defines "Confidential and Proprietary Information" to mean "information disclosed to the Employee or known to the Employee as a consequence of or through Employee's employment with Stryker, including information conceived, originated, discovered or developed by Employee." (Confidentiality Agreement 1, ECF No. 23-4.) The Code of

Conduct prohibits disclosure of confidential information, which it defines to include "all non-public information that might be of use to competitors or harmful to the Company and its customers if disclosed." (Anderson-Kline Decl., Ex. B, Code of Conduct ¶ 9, ECF No. 396-1.) Stryker also notes that it would be unethical for doctors or hospitals to give out competitor pricing. (Campana Dep. 152, ECF No. 402-5.)

Stryker has also presented evidence that if it provides pricing to a customer that differs from the public list price, Stryker protects the confidentiality of the offered price by including the following confidentiality notice in proposals:

> CONFIDENTIALITY NOTICE: Recipient will not disclose to any third party the terms of this proposal or any other information, including any pricing or discounts, offered to be provided by Stryker to Recipient in connection with this proposal, without Stryker's prior written approval, except as . . . required by law.

(OLOL Proposals, ECF Nos. 396-7, 396-8; Baird Dep. 10-11, ECF No. 402-2.) Stryker also includes a confidentiality provision in product placement agreements as follows:

> **Confidentiality**. The parties shall hold in strictest confidence the terms of this Agreement, as well as any information and materials which are related to the business of the other party or are designated by any such party as proprietary and confidential, herein or otherwise. The parties hereby covenant that they shall not disclose such information to any third party, except for agents or consultants, without prior written authorization of the party to whom such information relates.

(Product Placement Agreement ¶ 9, ECF No. 402-9.)

Stryker has also presented evidence that in the medical device industry a company's published list prices do not reflect the negotiated price or discounts for items sold to a

hospital. (Barnette Decl. ¶¶17-18; Baird Dep. 34.) Prices can fluctuate significantly and differ from contract to contract, based on purchase history, volume, or specialization or customization of a part. (Barnette Decl. ¶17.) It is virtually impossible to identify the negotiated pricing of a competitor through legitimate means. (*Id*.) As a matter of practice, hospitals also do not give out negotiated pricing, either to Stryker CMF or one of its competitors. (*Id*. ¶¶ 20, 24; Cameron Dep. 146, ECF No. 346-13; Barker Dep. 28, 35-36, ECF No. 402-3; Baird Dep. 35, ECF No. 402-2.)

Stryker has also presented evidence that customer preferences, which include products the doctors or hospitals like to use, their set configuration, and custom plates, "take years to understand, and this information is certainly not openly available." (Cameron Dep. 126, 136, ECF No. 346-13.) According to Cameron, new market entrants like Biomet would not know this information and if such information was given to a competitor, it would be detrimental to Stryker. (Cameron Dep. 126.)

The fact that some of the information at issue was created by Ridgeway himself does not necessarily mean that it is not a trade secret. *See Kelly Servs., Inc. v. Noretto*, 495 F. Supp. 2d 645, 658 (E.D. Mich. 2007) ("It is the fact that Defendant had access to this information through his employment and position -- and not other means -- that places it under the MUTSA."). On the other hand, the general knowledge of an employee is not a trade secret, *Lowry Holding Co., Inc. v. Geroco Tech Holding Corp*., No. 303694, 2012 WL 1890231, at *3 (Mich. Ct. App. 2012), and the Court must be careful not to interpret MUTSA

as a "statutorily created non-compete agreement between sales people and their former employers." *McKesson*, 266 F. Supp. 2d at 597.

The parties' cross-motions for summary judgment on the MUTSA claim essentially request this Court to decide, as a matter of law, that Stryker's pricing and doctor preference information does or does not constitute a trade secret as a matter of law. The Court will not make such a ruling on the current record. There are material issues of fact as to the extent to which Stryker's pricing and doctor preference information was widely known, the adequacy of the measures Stryker took to guard the secrecy of the information, the ease or difficulty with which the information could be properly acquired or duplicated by others, and the value of the information to Stryker. Because the Court cannot make a determination on the current record as to whether Stryker's pricing and doctor preferences are trade secrets, Stryker's motion for summary judgment on the misappropriation claim must be denied.

Assuming there is a trade secret at issue, the Court must still consider whether Ridgeway is entitled to summary judgment on his additional defenses that he did not acquire any trade secret by improper means, that he never disclosed or used any trade secrets with Biomet, and that Stryker cannot prove damages.

4. Use or Disclosure

Ridgeway contends that he never used any trade secrets with Biomet because he was terminated by Biomet before any sales commenced, and he contends that Stryker has produced no actual evidence that Ridgeway disclosed any information to Biomet or any other individual.

Stryker contends that Ridgeway disclosed customer preferences, par levels and set needs to Biomet both while he was still a Stryker employee and after, and that he used Stryker's OLOL pricing to prepare a more favorable bid on Biomet's behalf.  In support of the use or disclosure element, Stryker has produced evidence that at a July 3, 2013, meeting, in response to Biomet's request for information on doctor preferences, Ridgeway disclosed that Stryker had a surgeon who liked Stryker's locking technology and offered to supply a sample locking plate for Biomet to copy.  He also told Biomet that its tray did not hold enough implants.  (*See* Border Dep. 9, 16, 19, 159,162-63; Ridgeway Dep. 139-41; P. Lewis Dep. 162, ECF No. 346-14.)  On August 4, 2013, Ridgeway told Biomet what sets and par level he would need for the hospitals in his territory.  (Ridgeway Dep. at 152-153, 234, ECF No. 346-19; Ridgeway 8/4/2013 email, ECF No. 376-8.)  On September 26, 2013, Ridgeway sent an email to OLOL comparing Stryker CMF products and pricing to his new Biomet products and pricing, and noting that almost all products were below OLOL's existing pricing with Stryker.  (Ridgeway 9/26/2013 email to Barker with pricing proposal attachment, ECF No. 346-29; Cameron Dep. 158, 176-77, ECF No. 346-13; Barker Dep. 13-14, 19-27, ECF No. 346-31; Blouin Dep. 36, ECF No. 346-33.)  Assuming pricing and doctor preferences are trade secrets, Stryker has produced sufficient evidence to create an issue of fact as to use or disclosure.

5. Acquisition by Improper Means

Ridgeway contends that Stryker's MUTSA claim fails because Stryker has not shown that Ridgeway acquired any trade secrets by improper means.

Stryker's MUTSA claim is not based on Ridgeway's improper acquisition of trade secrets, but on his use or disclosure of trade secrets. The statute provides in pertinent part that misappropriation means "(ii) disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following: . . . (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ." Mich. Comp. Laws § § 445.1902(b)(ii)(B). Liability under this section does not require that acquisition by improper means.

Stryker has presented evidence that Ridgeway received trade secrets relating to Stryker CMF and NSE. (Mercado Decl. ¶¶ 23-24.) Stryker has also produced evidence through the non-compete and confidentiality agreements as well as the code of conduct, that Ridgeway acquired this information under circumstances giving rise to a duty to maintain its secrecy or limit its use. Accordingly, Ridgeway's claim that he did not acquire any trade secret by improper means does not entitle him to summary judgment on Stryker's MUTSA claim.

6. Damages

Finally, Ridgeway contends he is entitled to summary judgment due to Stryker's inability to prove damages as to any lost trade secrets. Ridgeway has repeatedly asserted that he never completed a sale of any competitive Biomet products, and that no witness has testified that they stopped buying Stryker products, or purchased Biomet products instead,

31

due to any misappropriation of a trade secret by Ridgeway. Neither has Stryker engaged any expert witness to establish the economic value of any trade secret disclosed or used by Ridgeway.

> MUTSA provides for the recovery of damages for misappropriation of trade secrets:

> Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

Mich. Comp. Laws § 445.1904. Pursuant to the statute, the award of damages is not contingent on the sale of a competitive product.

Stryker contends that it is not required to show that Ridgeway was unjustly enriched, nor is it required to proffer an expert witness to testify as to the economic value of its trade secrets. Stryker contends that all it must show is disclosure and use of the trade secrets to establish damages.

Stryker's argument ignores the holding in *MSC.Software Corp. v. Altair Eng'g, Inc.*, No. 07-12807, 2014 WL 6485492 (E.D. Mich. Nov. 13, 2014), a case it cited, that it must introduce competent evidence at trial of the damages suffered by the misappropriation. *Id.* at *16. If a party is relying on a reasonable royalty as the measure of damages, it is likely incumbent on that party to present an expert witness so that the jury is not required to invent a reasonable royalty out of thin air. *Id.* at **3, 16.

Stryker has not indicated how it intends to prove damages for its trade secrets claim. However, it has presented some evidence that it was compelled to lower its prices at two hospitals, OLOL and Ochsner, to defend itself against Ridgeway's use of Stryker's trade secrets.  (Border Dep. 105-06, 144-45, ECF No. 376-5; Blouin Dep. 30-31, 136, ECF No. 346-33.)  Although Ridgeway disputes Stryker's assertion that it lowered its prices because of his disclosure or use of any trade secrets, Stryker's evidence is sufficient to create a material issue of fact for trial.

For the reasons stated herein, Stryker's motion for partial summary judgment on its breach of contract, breach of fiduciary duty, and misappropriation of trade secret claims against Ridgeway  (Counts I, III and V of the amended complaint) (ECF No. 345), and Ridgeway's cross-motions for partial summary judgment on Stryker's misappropriation of trade secrets and breach of fiduciary duty claims (ECF Nos. 350, 358) are denied.

An order consistent with this opinion will be entered.


Dated: <u>December 14, 2015</u>              <u>/s/ Robert Holmes Bell</u>
                                             ROBERT HOLMES BELL
                                             UNITED STATES DISTRICT JUDGE