UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STRYKER CORPORATION, et al.,

Plaintiffs,

v.

CHRISTOPHER RIDGEWAY, et al.,

Defendants.

and

STONE SURGICAL, LLC,

Plaintiff,

v.

STRYKER CORPORATION, et al.,

Defendants.

_____/

Case No. 1:13-CV-1066

HON. ROBERT HOLMES BELL

Case No. 1:14-CV-889

# **O P I N I O N**

Plaintiffs Stryker Corporation and Howmedica Osteonics Corporation (collectively, "Stryker") bring this action against Defendants Christopher Ridgeway, Richard Steitzer and Biomet Microfixation, LLC ("Biomet"). In the amended complaint, Stryker asserts several claims, including: breach of contract against Defendant Richard Steitzer (Count II); misappropriation of trade secrets in violation of the Michigan Uniform Trade Secrets Act (MUTSA), Mich. Comp. Laws § 445.1901, against all Defendants (Count IV); and tortious

interference with contracts against Biomet (Count V). Before the Court is Steitzer and Biomet's motion for summary judgment on the foregoing claims. (ECF No. 364.)[1]  The motion will be granted in part and denied in part.

# I.

Stryker manufactures and sells medical devices. Until June 2013, Steitzer was employed by Stryker as a sales representative in the Neuro Spine ENT business unit and Craniomaxillofacial ("CMF") division of Stryker, with responsibilities in the Albany, New York region. (Am. Compl. ¶¶ 2, 4.) In connection with his employment, Steitzer signed agreements not to compete with Stryker and not to disclose Stryker's confidential information. After he left Stryker, he was hired by Senops, LLC ("Senops"), a distributor for Biomet. Like Stryker, Biomet sells CMF devices. Stryker claims that Biomet and the owner of Senops, Christopher Beck, devised a plan to take Stryker's business in Albany by hiring Steitzer. Stryker further claims that Steitzer accepted Senops' offer sometime prior to his resignation from Stryker, then disclosed Stryker's confidential information to Senops and started working on behalf of Senops and Biomet, in violation of MUTSA and his employment agreements.

---

[1]The ECF numbers in this Opinion refer to the docket in Case No. 1:13-CV-1066, except as otherwise indicated. The motion before the Court is also found at ECF No. 319 in consolidated Case No. 1:14-CV-889.

Ridgeway was also employed by Stryker as a sales representative in the CMF division, with responsibilities in Louisiana. Stryker terminated him in September 2013 after it learned that he was working for Biomet. Stryker claims that, like Steitzer, he breached the non-compete restrictions and confidentiality obligations in his employment agreements.

## II.

Rule 56 of the Federal Rules of Civil Procedure requires the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)). When such a motion is filed by the defendant, the "plaintiff must do more than rely merely on the allegations of her pleadings or identify a 'metaphysical doubt' or hypothetical 'plausibility' based on a lack of evidence; [a plaintiff] is obliged to come forward with 'specific facts,' based on 'discovery and disclosure materials on file, and any affidavits[.]'" *Chappell v. City of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c); *Matushita*, 475 U.S. at 586-87). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

## III.

### A. Breach of Contract (Count II)

In his non-compete agreement with Stryker, Steitzer agreed not to "[e]ngage or participate in any . . . activity competitive with [Stryker]," including "activity that is directed to or designed to solicit or divert any of [Stryker]'s customers . . . for [Steitzer's] or any . . . competitor's benefit." (Non-Compete Agreement, ECF No. 23-3, PageID.447.) He also agreed not to "solicit, attempt to solicit, assist another to solicit [Stryker's] Customers, or in any other way, attempt to influence [Stryker's] Customers to alter or terminate their business relationship with [Stryker]." (*Id.*) These restrictions applied during the term of his employment and for up to one year thereafter. The stated purpose of the agreement was to ensure that Steitzer would not "unfairly compete" using "confidential information relating to [Stryker's] customers, their purchasing patterns, discount codes, pricing formulae and other proprietary information" obtained by Steitzer by virtue of his employment. (*Id.*)

Steitzer also signed a confidentiality agreement in which he agreed not to disclose Stryker's confidential and proprietary information, which includes all information that he received through his employment, but excludes information "which at the time of disclosure is in the public domain." (Employee Confidentiality & Intellectual Property Agreement, ECF No. 23-5, PageID.461-62.) Stryker claims that Steitzer breached both of these agreements.

### 1. Damages & Causation

Steitzer contends that Stryker cannot succeed on its breach-of-contract claims because it cannot prove that any alleged breaches of the non-compete and confidentiality agreements caused any damages. Proof of damages is an essential element of a claim for breach of contract. *See Aidamark, Inc. v. Roll Forming Corp.*, 580 F. App'x 408, 414 (6th Cir. 2014). According to Stryker, "[n]ot a single doctor or hospital employee has testified or will testify either that Steitzer violated his Non-Compete Agreement or that anything Steitzer did or said during 2013 through June 2014 caused them to stop buying Stryker products. Instead, Stryker's damages allegations are based entirely upon inadmissible hearsay and speculation." (Defs.' Mem. in Supp. of Mot. for Summ. J. 13, ECF No. 365.)

The Court disagrees. As discussed below, Stryker has presented evidence by which a reasonable jury could find that Steitzer breached his agreements, thereby causing Stryker to lose market share to Biomet.

### (a) Biomet and Senops recruit Steitzer.

In 2012, Senops did not have any sales in Albany. (Beck Dep. 53-54, ECF No. 410-6.) In March of that year, Beck proposed to Guy Cassone, Biomet's regional manager, that they should recruit Steitzer in order to take Stryker's business in the region. (Beck Dep. 131-33; Emails, ECF No. 410-8.) Cassone responded that he would like to "reach out" to Steitzer, and that Steitzer should see Biomet's "commitment" to Senops. (*Id.*) On April 9, 2012, Beck sent Cassone a document detailing Senops' expected sales and proposing commissions rates if

Senops hired Steitzer. (Email, ECF No. 410-9.) Beck indicated that Steitzer could bring over $1 million in business in the first year, but that Senops would require a "supplement" from Biomet in order to provide Steitzer with sufficient compensation. (*Id.*) Cassone forwarded the proposal to Mark Michaelson, Biomet's Director of Sales. (*Id.*) On April 18, Beck offered Steitzer a guaranteed salary of $175,000, noting that the guarantee "doesn't work" unless Steitzer/Senops could "bring over at least $500k in business . . . in the first year." (Email, ECF No. 410-10.) Beck was aware of Steitzer's non-compete agreement, but Steitzer's salary guarantee was not contingent on whether Stryker held him to it. (*See id.*) Steitzer claims that he rejected Beck's offer. (Steitzer Dep. 27, ECF No. 407-1.) However, Beck sent information about Biomet's CMF products to Steitzer's wife's email address over the next several months. (Emails, ECF Nos. 410-14, 410-15.)

(b) Beck and Biomet set aside product sets for Albany.

In January 2013, as discussions with Steitzer were ongoing, Beck and Cassone set aside product sets for the Albany market. (Beck Dep. 87-90.) Beck later described the sets as being necessary for a "quick conversion" in Albany. (Email, ECF No. 410-19.)

(c) Steitzer agrees to work for Senops.

In February 2013, Beck sent Steitzer another proposal with a salary guarantee of $175,000. (Email, ECF No. 410-21.) Steitzer ostensibly agreed to this proposal, because it is the last formal proposal that Senops communicated to him before he officially joined

Senops. (Beck Dep. 73.) Beck subsequently sent him more information about Biomet's CMF products. (Emails, ECF Nos. 410-24, 410-26.)

On May 10, Beck wrote Cassone to inform him that Senops would be hiring "someone" to sell sternal products (i.e., not CMF products) in Albany. (Email, ECF No. 410-27.) Cassone asked for more information, and Beck clarified that he was referring to Steitzer. (Email, ECF No. 410-28.)

(d) Steitzer speaks to his customers about Biomet.

Sometime prior to his departure from Stryker, Steitzer made it known to the doctors he was working with at Albany Medical Hospital and St. Peters Hospital that he would be leaving Stryker to work for Biomet, and that if Stryker did not enforce its non-compete agreement, he would be seeing them regularly on behalf of Biomet. (Steitzer Dep. 43-46.) If Stryker did enforce its non-compete, Steitzer told them, then they would be seeing a new sales representative for Stryker and would likely see a new one for Biomet. (*Id.*) Although there is no indication that Steitzer expressly encouraged Stryker's customers to switch over to Biomet, a jury could reasonably determine that his comments were intended to have that effect. There was no need for Steitzer to mention his plan to continue seeing his customers on behalf of Biomet, or even to mention Biomet at all, unless he intended for them to switch over.

Moreover, the evidence suggests that these comments, as well as Steitzer's other actions described below, were effective. At the time, all of the doctors at St. Peters used

Stryker CMF products exclusively. (*Id.* at 53.) After Steitzer left Stryker, none of them did so. (Campana Dep. 15, ECF No. 407-5.) In the fall of 2013, doctors at St. Peters told Stryker's new sales representative for Albany, Zach Ten Eyck, that they had switched over to Biomet because Steitzer had moved to Biomet. (Ten Eyck Dep. 19-20, ECF No. 410-54.)

(e) Steitzer assists Senops' new sales representative.

Evidence suggests that Steitzer assisted Senops with recruiting a sales representative who would sell Biomet's CMF products to Stryker's customers, and later assisted that representative in his work. In April 2013, Steitzer told an acquaintance, Michael Elsworth, about an opportunity to work for Senops as a sales representative, and then they met together to discuss the opportunity. (Elsworth Dep. 14-17, ECF No. 407-36.) Elsworth had just graduated from college four months' prior to that time. (*Id.* at 10.) Elsworth had no prior experience selling medical devices, and no relationships with doctors or hospitals in Albany. (Beck Dep. 92.) On April 28, Senops hired Elsworth to be its sales representative in Albany for CMF products. On May 8, only two weeks after Elsworth began working for Senops, Biomet landed its "first case" at St. Peters, scheduled to take place on May 13. (Email, ECF No. 410-34.) According to Stryker's sales staff, it would have been nearly impossible for someone in Elsworth's shoes to have achieved this feat alone, without assistance from someone who had relationships with the hospital administrative staff, and who knew the parts required for a particular procedure, as well as the specific needs of particular surgeons. (Campana Dep. 69.) Steitzer admits that he gave Elsworth a list of doctors that he worked

with in Albany. (Steitzer Dep. 69.) Later that year, he sent Elsworth detailed notes about the doctors and staff that he worked with at Albany Medical and St. Peters, including information about their personal preferences and the parts that they used in their procedures. (*See* Doctor Notes, ECF Nos. 410-67, 410-68.) Stryker claims that this information is a confidential trade secret.

Steitzer was also seen with Elsworth at the hospitals in Albany in the fall of 2013, ostensibly to assist Elsworth with the sale of Biomet's CMF products. Ten Eyck saw Steitzer at St. Peters and Albany Medical on a number of occasions. (Ten Eyck Dep. 75-77.) On one occasion, he saw both Steitzer and Elsworth together in the operating room with Dr. Buccino, one of Steitzer's customers from his time at Stryker, during a CMF procedure. (*Id.* at 78-80.)

>  (f) Steitzer assists Senops with ordering product sets and setting prices for Biomet products.

Evidence also indicates that Steitzer helped Beck identify the specific needs of Stryker's customers in Albany, and set prices for Biomet's CMF products, using Stryker information. On or about April 23, Beck asked Biomet to provide a price list for St. Peters. (Beck-Bresland Emails, ECF No. 410-31.) Beck indicated that he would "play with the pricing" and send it back for approval. (*Id.*) On May 2, Steitzer accessed and emailed himself documents identifying Stryker's then-stocked consignment items at St. Peters. (Email, ECF No. 410-32.) Stryker contends, and Defendants do not deny, that Steitzer also possessed purchase orders for St. Peters which identified Stryker's pricing for St. Peters. Stryker's

pricing agreement with St. Peters was not publicly available. (Baird Decl., ECF No. 410-41.) Stryker claims that both its par levels and its pricing are trade secrets.

A few days later, Beck prepared a document identifying Biomet's "set" needs for St. Peters and Albany Medical, and sent it to Biomet. (Email, ECF No. 410-33.) On May 13, Beck emailed Cassone, telling him, "I am in desperate need of some trauma one sets, neuro sets, and IQs for Albany terr. We are running up there and need to be prepared for an increased (sic) in caseload ASAP." (Email, ECF No. 410-35.) The next day, Beck sent Biomet a modified price list for St. Peters for Biomet's approval. Added to the price list was a column containing part numbers for Stryker products that corresponded to Biomet's products. (St. Peters Pricing, ECF No. 410-38.) The list also identified the "most commonly used" Stryker plate at St. Peters. (*Id.*) Almost all of the Stryker items referenced in the list are contained in the consignment documents accessed by Steitzer on May 2. Moreover, some of the prices in the list were modified by Beck. In every instance in which there is a corresponding Stryker part, Beck proposed a price lower than Stryker's, but higher than the price in Biomet's initial proposal.

On May 15, Beck sent another email to Biomet, requesting specific product sets for Drs. Busino and Kleinaman at St. Peters (Email, ECF No. 410-19; Beck Dep. 91), who worked exclusively with Steitzer during his time at Stryker (Steitzer Dep. 39-40). On or about May 22, Beck asked Biomet for consignment sets for St. Peters. In many instances, the number of Biomet parts requested by Beck is the same as, or similar to, the number of

corresponding Stryker parts identified in the consignment documents accessed by Steitzer on May 2.

In July 2013, Elsworth sent Steitzer a price list for St. Peters so that Steitzer could cross-reference Biomet product numbers with Stryker product numbers and suggest pricing for Biomet products at Albany Medical. (Elsworth Dep. 57-58, 60; Steitzer Dep. 74-76.) At the time, Steitzer possessed Stryker pricing proposals for St. Peters and Albany Medical from June 2013 which were identified as "confidential." (Elsworth Dep. 58, 69; Stryker Proposals, ECF Nos. 410-2, 410-3.) He sent the Albany Medical proposal to Elsworth, telling him that it could be used for pricing. On August 6, Steitzer sent Elsworth a modified Biomet pricing proposal for use at Albany Medical. (Email & Attachment, ECF No. 410-69.) Elsworth then sent it to Biomet for approval. (Elsworth Dep. 71-72.) The pricing in this proposal was subsequently incorporated into an agreement between Biomet and Albany Medical dated August 20, 2013. (*See* Inventory Stocking/Consignment Agreement, ECF No. 410-72.)

The price administrator at Albany Medical, Anne Didio, later told Ten Eyck that Steitzer was the one who gave her the part numbers and pricing for Biomet products. (Ten Eyck Dep. 101-05.) On one occasion, Stryker received an email from Didio that was sent to Steitzer's old email address, in which she requested price information for a Biomet part.

(g) Stryker's sales decline and Senops' sales increase.

The reduction of Stryker's sales in Albany after Steitzer's departure, and the increase in sales by Senops, also suggest that Steitzer was responsible for moving business from

11

Stryker to Biomet. From May 2012 to May 2013, before Steitzer left Stryker, Senops' yearly sales at Albany Medical and St. Peters were approximately $191,000 and $10,400, respectively. (Beck Dep. 97-98.)  These were for sternal products, which Stryker does not sell. (*Id.* at 100.) From June 2013 to June 2014, Senops' sales at these two hospitals grew to approximately $620,000 and $374,000, respectively.  (*Id.* at 101-02.) During the same time period, Stryker's sales to these hospitals declined from over $100,000 per month to less than $15,000. (Cameron Dep. 69, ECF No. 410-1.)

Steitzer contends that other factors are attributable to Stryker's decline in sales, including the fact that: (1) after he left the company, Stryker did not have a CMF sales representative in Albany for four months; (2) Beck and Elsworth were actively working in Albany for several months prior to Steitzer's departure; and (3) two other device manufacturers were competing for Stryker's business in Albany. At best, however, this evidence merely suggests that there could be other reasons for some or all of Stryker's loss of business.  It does not demonstrate that Steitzer is entitled to summary judgment, because it does not rule out the possibility that his actions are responsible for those losses. Indeed, even though Stryker did not have a *designated* sales representative in Albany for several months, it sent other representatives to fill in for Steitzer. (*See* Tierney Dep. 42-45, ECF No. 407-6; Campana Dep. 21; Albano Dep. 50-51, ECF No. 407-87.) Moreover, as to Beck and Elsworth, the evidence suggests that Steitzer assisted them in this work. As to other device

12

manufacturers, Steitzer offers no evidence of comparable gains by other competitors to account for the substantial losses experienced by Stryker.

In short, Stryker has presented sufficient evidence on which a reasonable jury could find that Steitzer breached his non-compete and confidentiality agreements, and that these breaches contributed to Stryker's loss of business. Thus, the Court rejects his argument that he is entitled to summary judgment with respect to causation and damages.

### 2. Confidentiality Agreement

Steitzer also contends that Stryker cannot succeed on any claim with respect to the confidentiality agreement because the information in the documents that Steitzer gave to Elsworth, i.e. Stryker's pricing proposal for Albany Medical and Steitzer's notes about doctor preferences, was not confidential. (*See* Confidentiality Agreement, ECF No. 23-5, PageID.461 (excluding information "which at the time of disclosure is in the public domain" or which "after disclosure, becomes part of the public domain by publication or otherwise through no act on Employee's part").)

#### (a) Albany Medical pricing proposal

As to the information in the pricing proposal, Stryker's Director of National Accounts and Strategic Pricing testified that a sales representative can "provide [a pricing proposal] to anybody." (Baird Dep. 15, ECF No. 365-24.) In addition, Stryker has a general idea of the pricing of its competitors. (*See id.* at 18. ("We have an idea where everybody normally is. . . . I mean, generally speaking, we know where pricing exists in the craniomaxillofacial

13

space.").) Other Stryker employees testified similarly. (*See* Campana Dep. 152, ECF No. 368-4 ("You have an understanding where our competitors are trying to price out compared to where we are.").) Furthermore, on occasion, hospitals will disclose the prices that a competitor is charging (Cruikshank Dep. 133-34, ECF No. 365-27), or a sales rep will sometimes come across the information at the hospital if it is "left out." (Tierney Dep. 130, ECF No. 365-3.)

On the other hand, Stryker notes that the proposal disclosed by Steitzer was specifically designated as "confidential," with a notice that the recipient "will not disclose to any third party the terms of this proposal or any other information, including any pricing or discounts, offered to be provided by Stryker . . . in connection with this proposal . . . ." (Albany Medical proposal, ECF No. 410-69.) Other individuals testified that hospitals generally do not disclose the prices they are paying for their products because "they are pretty strict about confidentiality." (Tierney Dep. 130, ECF No. 407-6.) It would be "highly unusual" for them to disclose such information. (Baird Dep. 35, ECF No. 407-4.)

In light of this conflicting evidence, a factual dispute remains as to whether the product pricing in Stryker's pricing proposals was confidential. Some evidence indicates that there is a general awareness of pricing in the industry, and that specific information can be obtained from some hospitals in some circumstances. But that evidence does not establish that specific prices are generally known, let alone that the prices Stryker offered to Albany Medical in June 2013 were in the public domain. Neither party claims that Albany Medical

14

made this information publicly available, and there is no evidence that the hospital would have disclosed it if asked. Consequently, Steitzer is not entitled to summary judgment on this issue.

(b) Doctor Notes

Steitzer also claims that his notes about his customers' product preferences were not confidential. He cites evidence from Stryker's current/former employees that such information is "readily available to anybody that wants to know." (Mayfield Dep. 243, ECF No. 365-31.) It can be found by looking at a doctor's case cart, on "something that anybody can walk by and pick up." (Green Dep. 20, ECF No. 365-26.) Nurses would also provide that information. (Lewis Dep. 31-32, ECF No. 365-32.)

In response, Stryker offers testimony from one of its employees that "customer preferences take years to understand, and this information is certainly not openly available." (Cameron Dep. 126.) On further questioning, this employee conceded that "a rep could find out this information, it would just take time." (*Id.* at 130.)

Based on the foregoing, the Court finds that there is a dispute of fact as to whether doctor preferences were confidential. Consequently, Steitzer is not entitled to summary judgment as to the disclosure of his notes.

**B. Count IV: Misappropriation of Trade Secrets**

Defendants seek summary judgment on Stryker's claims against Steitzer and Biomet regarding the misappropriation of trade secrets.

15

### 1. Actual Misappropriation (Biomet & Steitzer)

Defendants contend that Stryker has identified only two trade secrets as the subject of its claim: the doctor preferences in the Doctor Notes and the pricing information in the Albany Medical proposals.[2] Defendants contend that this information is not confidential and that Stryker did not use reasonable efforts to maintain its secrecy.

(a) Secrecy

Defendants claim that doctor preferences and pricing are not trade secrets because they are not confidential. As discussed in the Court's December 14, 2015 Opinion, however, Stryker has offered evidence that its pricing and information about doctor preferences are not readily available to new entrants to the market. (12/14/2015 Op. 14, ECF No. 439.) Consequently, this is a question of fact for trial. (*Id.*)

(b) Reasonable Efforts

Defendants further contend that Stryker did not take reasonable efforts to maintain the secrecy of their information. However, the Albany Medical proposal contained a confidentiality notice and there is at least a question of fact as to whether the doctor preferences and pricing were covered by Steitzer's confidentiality agreement. *See* Section III.A.2(a). Defendants concede that the use of non-disclosure agreements can constitute a

---

[2]In response, Stryker identifies its pricing, customer preferences, and "par levels" (i.e., the number of plates and screws that a hospital stocks) as trade secrets. (Pls.' Resp. in Opp'n to Mot. for Summ. J. 3, ECF No. 407; *see also* Pls.' Answers to Interrog., ECF No. 365-67, PageID.8583 (identifying the trade secrets as "Stryker pricing information, specific physician needs, preferences and idiosyncrasies, and specific set needs and part needs at Stryker's former customers in the Albany region.").)

reasonable measure, and this Court has also recognized that the use of employee confidentiality agreements and confidentiality notices constitute reasonable efforts to maintain the secrecy of a trade secret. *See, e.g.*, *Veteran Med. Prods., Inc. v. Bionix Dev. Corp.*, No. 1:05-cv-655, 2008 WL 696546, at *8 (W.D. Mich. Mar. 13, 2006) (collecting cases). Thus, Defendants are not entitled to summary judgment on this basis.

### 2. Threatened Misappropriation (Steitzer)

Defendants contend that there is no evidence that Steitzer threatened to misappropriate any trade secrets, because Stryker has not provided evidence of the requisite "duplicity" to support its claim. Under MUTSA, "[a]ctual or threatened misappropriation [of trade secrets] may be enjoined." Mich. Comp. Laws § 445.1903(1). Misappropriation involves the use, disclosure or acquisition of a trade secret. Mich. Comp. Laws § 445.1902. "To establish threatened misappropriation, a party must specifically identify the trade secret likely to be misappropriated and must convince the court of the former employee's 'duplicity' by proffering evidence indicating a significant lack of candor or willingness to misuse trade secrets." *Gene Codes Corp. v. Thomson*, No. 09-14687, 2011 WL 611957, at *5 (E.D. Mich. Feb. 11, 2011).

As to Steitzer, Stryker has offered evidence that Steitzer *actually* misappropriated Stryker's trade secrets. He used the information in the Albany Medical pricing proposal to set prices for Senops. Also, he sent a pricing proposal to Elsworth despite the fact that it contained a confidentiality notice. Furthermore, when doing so, he communicated with

Elsworth using his wife's email account, ostensibly in order to hide his actions. These facts are more than adequate to support a "willingness" to misappropriate.

### 3. Threatened Misappropriation (Biomet)

Biomet contends that there is no evidence that it threatened to misappropriate trade secrets, or that it encouraged, solicited, or condoned Steitzer's alleged misappropriation of Stryker's trade secrets. Stryker responds that liability for Steitzer's conduct is imputed to Biomet because it "knew of Steitzer's bad acts, participated in those bad acts, and did nothing to prevent [them]." (Pls.' Resp. in Opp'n to Mot. for Summ. J. 26, ECF No. 407.) But Stryker offers no evidence to support these assertions. Instead, its evidence indicates that Steitzer provided information to Beck and Elsworth, and that Beck and Elsworth used that information when ordering products from, and submitting price proposals to, Biomet. There is no evidence that Biomet, or any of its employees, knew or should have known that the orders or proposed prices received from Beck and Elsworth were based on Stryker's alleged trade secrets.

Stryker asserts that Biomet is vicariously liable for the conduct of Steitzer because Steitzer (or Senops) was an employee or agent of Biomet. But Stryker's assertion of vicarious liability for *actual* misappropriation does not address the issue raised by Biomet, which is whether Stryker can obtain injunctive relief against Biomet for *threatened* misappropriation.[3]

---

[3]To the extent Biomet seeks summary judgment as to actual misappropriation, the Court finds that Stryker has offered sufficient evidence to raise a question of fact as to whether Steitzer or Senops acted as agents of Biomet. Stryker notes that Biomet's Vice President of Sales that he considered Steitzer to be an "indirect employee." (Lewis Dep. 242-43, ECF No. 407-43.) In addition,

Stryker points out that Cassone worked with Beck to solicit Steitzer and move Stryker's business to Biomet; however, Stryker does not explain how this conduct is relevant to its claim. Soliciting the employee of a competitor is not the equivalent of soliciting confidential information and trade secrets from that employee. Moreover, Michigan has not adopted the "inevitable disclosure" doctrine; thus, the employment of a person with knowledge of "generalized" trade secrets (i.e. pricing, customers, margin, etc.) does not, in itself, suffice to establish a claim for threatened misappropriation. *See Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 535 (6th Cir. 2008).

Stryker notes that Biomet continues to use the pricing proposed by Steitzer in Biomet's price agreement with Albany Medical. But Biomet's price agreement is not a Stryker trade secret, and its continued use does not threaten to misappropriate any Stryker trade secrets. Consequently, the Court will grant summary judgment in favor of Biomet to the extent that Stryker asserts a claim for *threatened* misappropriation of Stryker's trade secrets in Count IV.

_____

the agreement between Biomet and Senops requires Senops and its employees to "devote their full business time, attention and best efforts to promoting, marketing and selling" Biomet products (Letter Agreement, ECF No. 410-7); it also requires Senops not to disclose confidential information about Biomet's products and to take formal training from Biomet (*id.*). Biomet notes that the agreement disclaims an agency relationship, but the manner in which the parties designate their relationship is not controlling. *Byzewski v. Aerotek, Inc.*, No. 242676, 2004 WL 95198, at *4 (Mich. Ct. App. Jan. 20, 2004).

## C. Count V: Tortious Interference with Contracts

Biomet seeks summary judgment on Stryker's claims that Biomet tortiously interfered with the non-compete and confidentiality agreements of Stryker's former employees, Steitzer and Ridgeway.

### 1. Ridgeway's Non-Compete

Biomet contends that Stryker has not provided evidence of Biomet's tortious interference with Ridgeway's non-compete agreement, because Ridgeway repeatedly told Biomet that he did not have a non-compete agreement with Stryker. (Ridgeway Dep. 344-45, ECF No. 365-13; Lewis Decl. ¶ 5, ECF No. 365-8.) Consequently, Biomet did not believe that he had one. (Lewis Dep. 20-21, ECF No. 365-12; Lewis Decl. ¶ 6.)  When it learned about the non-compete in Stryker's complaint in this action, it terminated its relationship with Ridgeway. (Lewis Decl. ¶ 8.)

"Tortious interference with contract exists when a third party to a contract, knowing of the contract, intentionally and wrongfully induces a breach of the contract which results in damage to a non-breaching party." *APCO Oil Co., Inc. v. Knight Enters., Inc.*, No. 262536, 2005 WL 2679776, at *2 (Mich. Ct. App. Oct. 20, 2005). "[I]t is an essential element of a claim of tortious interference with a contract that the defendant 'unjustifiably instigated or induced' the party to breach its contract." *Knight Enters. v. RPF Oil Co.*, 829 N.W.2d 345, 348 (Mich. Ct. App. 2013) (quoting *Derosia v. Austin*, 321 N.W.2d 760, 762 (Mich. Ct. App. 1982)). Thus, the defendant must be aware of the contract and purposefully instigate or

20

induce a breach. *See id.* In this case, however, the undisputed evidence shows that Biomet believed that Ridgeway did not have such an agreement.

Stryker contends that Lewis would have known of such an agreement because he was a sales manager with responsibility over Ridgeway when Ridgeway was hired as a sales representative. (Lewis Dep. 17, ECF No. 407-43.) He was also aware that, "[i]n general," Stryker required its sales representatives to sign non-compete agreements. (*Id.* at 68.) In addition, he acknowledged that non-compete agreements for sales representatives are standard in the industry. (*Id.* at 27-28.) But Lewis' awareness of industry standards and Stryker's "general" practices does not establish that he was aware of Ridgeway's agreement with Stryker, let alone that Biomet purposefully induced him to breach it. Lewis repeatedly asked Ridgeway about a non-compete agreement, and Ridgeway repeatedly denied that he was subject to one. Even if Ridgeway's statements were false, Biomet could not have intentionally and purposefully interfered with a contract that it believed did not exist. *See Knight Enters.*, 829 N.W.2d at 349 (finding no claim of tortious interference with a contract, in part, because the party to the agreement unequivocally, but mistakenly, represented that it was not in effect). Consequently, Biomet is entitled to summary judgment with respect to tortious interference with Ridgeway's non-compete agreement.

### 2. Ridgeway's Confidentiality Agreement

Biomet contends that there is no evidence that it interfered with Ridgeway's confidentiality agreement. According to Biomet, it never requested confidential information

from Ridgeway, and Ridgeway never provided it. (Lewis Aff, ECF No. 365-13.) However, Stryker has offered evidence that during a meeting between Lewis, Ridgeway, and Lauren Border, Lewis asked them, "[A]re there any products that your surgeons would need that [Biomet] would not have?" (Border Dep. 9, ECF No. 346-20.) Border responded that "we ha[ve] a physician that liked our . . . locking technology." (*Id.*) Ridgeway subsequently offered to supply a sample locking plate for Biomet to copy, told Biomet that its tray did not hold enough implants, and told Biomet what sets and par levels he would need for the hospitals in his territory. (*See* 12/14/2015 Op 30, ECF No. 439.) Stryker claims that its customer preferences and par levels are confidential. The foregoing evidence is sufficient to create an issue of fact for trial regarding Biomet's alleged interference with Ridgeway's confidentiality agreement.

### 3. Steitzer's Non-Compete

Biomet acknowledges that it was aware of Steitzer's non-compete agreement, but it claims that Lewis and Beck agreed that Steitzer would be "sternal only" (i.e., not involved in selling CMF products) so as to avoid the terms of his non-compete. (Lewis Dep. 244, ECF No. 365-32.) But Stryker's evidence indicates that Beck worked with Cassone to recruit Steitzer for the very purpose of taking Stryker's business. Cassone also approved a proposed compensation plan for Senops and Steitzer based on the assumption that Steitzer would bring over significant business from Stryker. Cassone then made it possible to convert Steitzer's

customers by setting aside product sets for Albany. The foregoing evidence is sufficient to create a factual dispute regarding Stryker's claim that Biomet intentionally induced Steitzer to violate his non-compete agreement.

### 4. Steitzer's Confidentiality Agreement

Biomet argues that there is no evidence that it induced or encouraged Steitzer to share any of Stryker's confidential information. Stryker responds that Biomet knew or should have known that Steitzer gave confidential information to Beck, yet it did nothing to prevent it. For instance, in May 2013, shortly after Beck announced that he would be hiring Steitzer, Biomet received a pricing proposal containing Stryker part numbers. Also, in August 2013, Biomet received another proposal from Beck that had adjusted Biomet's pricing. However, knowledge of a breach and a failure to correct it are not sufficient in themselves to demonstrate intentional and purposeful interference. As the Michigan Court of Appeals has explained:

> "'[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.'" *CMI Int'l., Inc. v. Intermet Int'l. Corp.*, 251 Mich. App. 125, 131, 649 N.W.2d 808 (2002), quoting *Feldman v. Green*, 138 Mich. App. 360, 378, 360 N.W.2d 881 (1984). "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances." *Prysak v. R L Polk Co.*, 193 Mich. App. 1, 12–13, 483 N.W.2d 629 (1992). "If the defendant's conduct was not wrongful per se, the plaintiff must demonstrate *specific, affirmative acts* that corroborate the unlawful purpose of the interference." *CMI Int'l., supra* at 131, 649 N.W.2d 808.

*Badiee v. Brighton Area Sch.*, 695 N.W.2d 521, 539 (Mich. Ct. App. 2005) (emphasis added). Stryker has not provided evidence that Biomet committed a "per se wrongful act" for the purpose of interfering with Steitzer's confidentiality agreement. *See id.* Nor has it offered evidence of "specific, affirmative acts" by Biomet that would corroborate an intent to interfere with Steitzer's confidentiality agreement. *See id.*

Stryker claims that evidence of Biomet's knowledge and passivity provide a sufficient basis to infer purpose and motive, citing *MSC.Software Corp. v. Altair Eng'g, Inc.*, No. 2:07–cv–12807, 2014 WL 4740917 (E.D. Mich. Sept. 23, 2014). *MSC.Software* does not stand for that proposition, however. In that case, the defendant was actively involved in interfering with the contracts at issue. The defendant "approved" and "encouraged" employees at the plaintiff's company to improperly solicit other employees. *Id.* at *5. Stryker has not offered evidence that Biomet solicited, approved or encouraged Steitzer's alleged violations of his confidentiality agreement. Thus, Stryker's argument is without merit.

Based on the foregoing, the Court will grant Defendants' motion for summary judgment as to Stryker's claim that Biomet intentionally interfered with Ridgeway's non-compete agreement and Steitzer's confidentiality agreement. The motion is not granted as to Stryker's claims in Count V regarding interference with Ridgeway's confidentiality agreement and Steitzer's non-compete agreement.

## IV.

For the reasons stated herein, Steitzer and Biomet's motion for summary judgment will be granted solely as to Stryker's claims that (1) Biomet *threatened* to misappropriate a trade secret (part of Count IV); and (2) Biomet tortiously interfered with Steitzer's confidentiality agreement and with Ridgeway's agreement not to compete (part of Count V). In all other respects, the motion will be denied.

An order consistent with this opinion will be entered.


Dated: <u>January 29, 2016</u>                    <u>  /s/ Robert Holmes Bell              </u>
                                       ROBERT HOLMES BELL
                                       UNITED STATES DISTRICT JUDGE